**JEFFERSON SAVINGS AND LOAN AS-SOCIATION, etc., Appellant,**

v.

**LIFETIME SAVINGS AND LOAN AS-SOCIATION, etc., Appellee.**

**No. 21809.**

United States Court of Appeals Ninth Circuit.

June 6, 1968.

Rehearing Denied July 16, 1968.

---

Aaron Peck (argued), of McKenna & Fitting, Los Angeles, Cal., for appellant.

F. J. Weitkamp (argued), of Weitkamp, Riddle & Bedrosin, Granada Hills, Cal., for appellee.

Before HAMLEY and CARTER, Circuit Judges, and SMITH,* District Judge.

RUSSELL E. SMITH, District Judge.

In 1963 Jefferson Savings and Loan Association, a Colorado corporation (Jefferson), purchased from Lifetime Savings and Loan Association, a California corporation (Lifetime), a seventy-five per cent interest in thirty-seven loans secured by trust deeds on California real estate. These loans had been made by Lifetime. A "Loan Participation Agreement" delineated the rights of the parties, and provided, *inter alia,* that after foreclosure:

"17. \* \* \* Seller may manage, maintain, or dispose of property so acquired in any manner which it shall deem necessary, the parties hereto sharing ratably in the income and expense thereof. Upon such disposition of such property, Purchaser shall share ratably with Seller in the net proceeds of sale to the extent of Purchaser's share in the unpaid principal balance due on the loan. It is further understood that it shall be within the sole discretion of Seller to determine whether foreclosure shall be pursuant to a power of sale, or through court action, and as to whether or not a deficiency judgment shall be obtained."

In 1963 eight of the loans became delinquent. Lifetime foreclosed the trust deeds and at the Trustee's sale, acquired in its own name title to the eight parcels of real estate. Lifetime sold three of the tracts to one Durham and paid Jefferson seventy-five per cent of the purchase price. There is no controversy as to these parcels.

The remaining five parcels, together with six other parcels standing in Lifetime's name but in which Jefferson had no interest, were sold under a single contract to David Durham and wife. The Durhams paid no cash. The purchase

---

* Hon. Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

agreement provided that if the Durhams should pay within ninety days, the price would be $88,000.00, but if not, then they would have to pay a "long term" price of $105,500.00. This indebtedness was evidenced by a note secured by a trust deed. The ninety day price and the long term price for each of the eleven parcels were set out in the contract. There were provisions in the contract under which individual parcels might be paid for and released from the trust deed but there was no way in which the trust deed could be foreclosed as to individual tracts. The note called for monthly installments to be applied on the entire indebtedness. The long term price for the five parcels in which Jefferson was interested was $49,450.00, and the ninety day price was $41,900.00. Jefferson did not consent to this contract.

After the Durham contract had been executed Lifetime wrote Jefferson a letter identified as Exhibit 11:

"Don * * * the sale of Real Estate Owned properties about which we talked when you were here has actually been consummated.

"I enclose a Photostat copy of the sales agreement that was used. A total of eleven properties were involved and your Association was interested in five of them (old Loan No's. 433, 469, 438, 475 and 476; REO No's. 49, 68, 69, 81 and 82, respectively). We also enclose a Xerox copy of the closing statement.

"You will note that the sales agreement provides for two sales prices: one in case we are paid off in cash before November 6, 1964; and one in case we are called upon to carry a long term loan to Facilitate. The escrow was closed on the basis of the long term loan, however, as you will note by

the copy of the closing statement attached.

"Until the purchaser's performance as of November 6 is determined, we are unable to offer your Association any reasonable settlement, except your proportionate share of the collected payments on the $105,500.00 loan. In the event that Reverend Durham is able to take adavantge of the 90 day price, it would appear that your Association would receive 75% of the net sales proceeds *of* $31,099.15." (Emphasis added.)[1]

The Durhams did not pay within ninety days and the long term arrangement went into effect. Lifetime and Jefferson were unable to agree upon the amount to which Jefferson was entitled and Jefferson filed this action seeking damages. A money judgment for $23,324.36, plus interest and costs was entered. Jefferson claims that it was entitled to seventy-five per cent of the long term price of $49,450.00, or a total of $37,087.-50, less a proper share of the expenses of the sale, and it appeals.

The District Court held that because the plaintiff had introduced Exhibit 11 (the letter above quoted), it was estopped to deny the recitals in it, one of which was that in the event the Durhams paid the ninety day price, Jefferson "would receive 75% of the net sale proceeds of $31,099.15." ($23,324.36)

The District Court relied upon language appearing in some California cases to the effect that a party who introduces in evidence an exhibit may not contradict or impeach it.[2]

■■ We do not regard this rule, if it be the rule in California, as one of substantive law which we are obliged to follow. It deals only with the effect of evidence.[3] In this circuit a party may intro-

---

**1.** It is probable that the *of* is a typographical error and should have been *or*. Seventy-five per cent of the 90-day price less costs of sale would have been exactly $31,099.15.

**2.** Davenport v. Stratton, 24 Cal.2d 232, 149 P.2d 4 (1944); Jackson v. Donovan, 215

Cal.App.2d 685, 30 Cal.Rptr. 755 (1963); Harrold v. Harrold, 100 Cal.App.2d 601, 224 P.2d 66 (1950); Dodds v. Stellar, 77 Cal.App.2d 411, 175 P.2d 607 (1946).

**3.** We are not here concerned with contractual recitals.

duce documents prepared by his adversary without being bound by them. Jerrold Electronics Corp. v. Wescoast Broadcasting Co., 341 F.2d 653 (9 Cir. 1965), cert. den. 382 U.S. 817, 86 S.Ct. 42, 15 L.Ed.2d 64 (1965).[4] The district court erred in fixing damages at $23,324.36.

Jefferson has not been paid and the amount due to it must be determined. When Lifetime purchased the land at the Trustee's sale, it held the same as a co-tenant with Jefferson in a 1 to 3 proportion.

 Lifetime, which held the whole of the properties in its name was a trustee for Jefferson. As a trustee, Lifetime had no right to place itself in a position where its interests were, or might be antagonistic to the interests of the beneficiary of the trust.[5] Obviously, if Jefferson, after the commingling, was to receive a percentage of the payments on the whole contract, its rights were protected only if its five properties and the other six were valued on exactly the same basis. In this case Lifetime fixed the values on all eleven properties and Jefferson was not bound by its trustee's valuations since the trustee did have an adverse interest.[6] Jefferson had a right to repudiate the Durham transaction.

 Having repudiated the Durham transaction, Jefferson now claims that it was entitled to seventy-five per cent of $49,450.00 (the long term price under the Durham contract). With this contention we do not agree. Jefferson was entitled to share in the net proceeds of the sale to the extent of its share in the unpaid balance due on the loan, but the net proceeds of this sale ultimately turned out to be a secured note for $105,500.00 and not $105.500.-00 in cash. Jefferson, as we have held, was not required to accept those proceeds. The fact that Lifetime may have acted improperly as a trustee does not entitle Jefferson to translate the words "net proceeds" as used in the "Loan Participation Agreement" into something which they do not mean, either actually [7] or by definition.[8] Upon the sale of a property in violation of trust, the beneficiary has a right to pursue either the proceeds of the property or the trustee.[9] Jefferson has elected to pursue the trustee and its damages are measured by its loss which, in this case, is the fair market value of the property sold at the time of the sale. The undisputed evidence is that at the time of sale the fair market value of the property was the ninety day price. Seventy-five per cent of that price, less seventy-five per cent of the costs of sale, is $31,099.15, and the cause is remanded with directions to enter judgment in favor of the plaintiff in that amount, together with interest from the date of sale.

4. The movement has been away from the practice of giving artificial values or protection to evidence by preventing the party introducing it from showing that it is false in whole or in part. See United States v. Freeman, 302 F.2d 347 (2 Cir. 1962), cert. den. 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963).

5. Jackson v. Smith, 254 U.S. 586, at 589, 41 S.Ct. 200, 65 L.Ed. 418 (1921); Bruun v. Hanson, 103 F.2d 685 (9 Cir. 1939), cert. den. 308 U.S. 571, 60 S.Ct. 86, 84 L.Ed. 479 (1939).

6. Since, after the commingling, Jefferson's rights were based on the percentage of value relationship between its five properties and the other six. Lifetime was in a position to reduce Jefferson's rights by valuing Jefferson's five properties at less than market value or valuing the other six at more.

7. No one here contends that the value of the note was $105,500.00, and the record shows that it was not.

8. Phelps v. Harris, 101 U.S. 370, 25 L.Ed. 855 (1879).

9. McElroy v. McElroy, 32 Cal.2d 828, 198 P.2d 683 (1948); Fields v. Michael, 91 Cal.App.2d 443, 205 P.2d 402 (1949).