ASSET RESTRUCTURING 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-615-CV





ASSET RESTRUCTURING FUND, L.P.,



 
 APPELLANT



vs.





LIBERTY NATIONAL BANK AND RESOLUTION TRUST CORPORATION, 


AS RECEIVER FOR CAPITAL CITY FEDERAL SAVINGS ASSOCIATION,




 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT



NO. 93-02463, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING



 




PER CURIAM


 Appellant Asset Restructuring Fund, L.P. ("Asset Restructuring"), appeals from
a summary judgment granted in favor of appellee Resolution Trust Corporation (the "RTC"). 
This case involves conflicting claims to funds deposited with the trial court. The court granted
the RTC's motion for summary judgment, ruling, as a matter of law, that the RTC owned the
funds in controversy. In two points of error, Asset Restructuring contends that the trial court
erred in granting the RTC's motion for summary judgment and denying Asset Restructuring's
motion for summary judgment because the RTC conveyed its interest in the funds to Asset
Restructuring by an "absolute" bill of sale. We will affirm the trial-court judgment.



BACKGROUND


 On November 8, 1985, Congress National Bank entered into a Loan Participation
Agreement (the "Participation Agreement") with Capital City Savings. In a typical loan
participation transaction, a lead bank sells to a participating bank (the "participant") a percentage
of a loan that has been made to a third party. In this case, Congress National, the lead bank,
made a loan to Pond Springs Joint Venture (the "Pond Springs loan"). Capital City Savings, the
participating bank, purchased an undivided 58.73% interest in the loan (the "participation"). 
Liberty National Bank, through a series of transactions, succeeded to the interest of Congress
National Bank under the Participation Agreement and became the lead bank. The RTC, as
receiver for Capital City Federal Savings Association, succeeded to Capital City Savings' interest
under the Participation Agreement and became the participant. 

 Pond Springs Joint Venture defaulted on its loan. When a borrower defaults on a
loan, the lender has a right to foreclose on the collateral securing the loan; thus, on July 5, 1988,
Liberty National Bank foreclosed on the collateral securing the Pond Springs loan. Several years
after the foreclosure but before Liberty National Bank had sold the collateral securing the Pond
Springs loan, the RTC sold its 58.73% interest under the Participation Agreement to Asset
Restructuring by Bill of Sale and Assignment of Loans dated October 14, 1992 (the "Bill of
Sale"). On December 31, 1992, Liberty National Bank sold the collateral for the Pond Springs
loan for $57,914.75 in cash and a $560,000.00 note (the "Note"). After the dispute between the
RTC and Asset Restructuring arose, Liberty National Bank also received $18,213.48 in proceeds
of an escrow account for taxes and insurance on the collateral, $18,290.09 in rental proceeds from
the collateral, and interest and principal payments on the Note.

 According to the Participation Agreement, Liberty National Bank, as lead bank,
is entitled to 41.27% of all cash proceeds from the sale of the collateral--$38,966.44--and 41.27%
of the payments on the Note as and when paid. Both the RTC and Asset Restructuring claim the
right to the remaining 58.73% of the cash proceeds of the sale and payments received on the Note. 
Liberty National Bank filed an interpleader and deposited the remaining $58,338.14 and 58.73%
of the future payments on the Note with the trial court. The trial court granted the RTC's motion
for summary judgment, finding that, as a matter of law, the RTC is the rightful owner of the
money and other property made the basis of the interpleader action.



DISCUSSION 


 We must determine whether the trial court correctly granted the RTC's motion for
summary judgment on the basis that the RTC owned the funds in controversy as a matter of law. 
The standards for reviewing a motion for summary judgment are well established: (1) The
movant for summary judgment has the burden of showing that no genuine issue of material fact
exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a
disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant
will be taken as true; and (3) every reasonable inference must be indulged in favor of the
nonmovant and any doubts resolved in its favor. Nixon v. Mr. Property Management Co., 690
S.W.2d 546, 548-49 (Tex. 1985). 

 This case revolves solely around the legal interpretation of two contracts: the
Participation Agreement and the Bill of Sale. Texas courts have long held that the interpretation
of an unambiguous contract is a question of law that is proper for summary judgment. Myers v.
Gulf Coast Minerals Management Corp., 361 S.W.2d 193, 196 (Tex. 1962). Neither party
contends that the Participation Agreement or the Bill of Sale is ambiguous, and we conclude that
they are unambiguous. (1) The trial court, therefore, correctly disposed of the case on summary
judgment. The sole issue before this Court is whether the trial court accurately interpreted the
documents in finding that the RTC owned the proceeds from the collateral. Because unambiguous
contracts are to be construed as a matter of law, we need not defer to the trial court's
interpretation of the documents. See Maxfield v. Northwood Homes, Inc., 582 S.W.2d 588, 589
(Tex. Civ. App.--Dallas 1979, writ ref'd n.r.e.). 

 The pivotal document in this case is the Bill of Sale. Pursuant to the Bill of Sale,
the RTC "absolutely s[old], transfer[red], assign[ed], set[]-over, and convey[ed]" to Asset
Restructuring: 



(a)   all of Assignor's right, title and interest in and to each of the loans identified
in the loan schedule attached hereto . . . , together with all promissory notes or
other evidence of indebtedness, if any, and together with . . . all collateral . . .
pledged in connection therewith, if any; . . .


(b)   . . . . provided, however, that Seller shall retain all right, title and interest
in and to any and all items of Collateral which, prior to the Closing Date [October
6, 1992], may have been foreclosed upon or otherwise acquired by Seller . . . .



(Emphasis added.) Asset Restructuring contends that paragraph (a) of the Bill of Sale (the
"granting clause") "absolutely" conveyed to it the RTC's entire interest in the Pond Springs loan
and the underlying collateral and that paragraph (b) (the "reservation clause") does not apply
because the RTC never possessed any "collateral" upon which it could foreclose. The RTC, on
the other hand, claims that it sold Asset Restructuring only a loan deficiency -- that is, the
remaining loan balance after applying the amount of the bid at the public foreclosure sale; this
loan deficiency excluded the RTC's interest in the collateral. Alternatively, the RTC contends
that the Pond Springs loan collateral falls within the reservation clause as "collateral . . .
foreclosed upon or otherwise acquired by Seller" and, thus, was not conveyed to Asset
Restructuring by the Bill of Sale. Asset Restructuring responds that, even if the reservation clause
applies in this case because the RTC had an interest in the collateral, the Court should not give
effect to paragraph (b) because it conflicts with the absolute conveyance made in the granting
clause. According to Asset Restructuring, when a granting clause and another clause in a
conveyance conflict, the granting clause must necessarily control. We disagree. If the provisions
in a contract do not contradict one another, the contract should be construed in its entirety so as
to give effect to all its provisions and not render any provision meaningless. R & P Enters. v.
LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 519 (Tex. 1980); Universal C.I.T. Credit Corp.
v. Daniel, 243 S.W.2d 154, 157-58 (Tex. 1951). In the present case, paragraphs (a) and (b) of
the Bill of Sale when read together can both be given effect without contradiction. The "provided
however" language of the reservation clause makes clear that the parties intended to restrict the
absolute scope of the granting clause. See Knight v. Chicago Corp., 188 S.W.2d 564, 566 (Tex.
1945) (noting that the essential meaning of "provided however" is "`but notwithstanding what is
granted above'"). 

 In order to determine whether the Bill of Sale conveyed the collateral securing the
Pond Springs loan to Asset Restructuring, we must determine whether the RTC had foreclosed
upon or otherwise acquired the collateral before October 6, 1992, within the terms of the
reservation clause. Liberty National Bank foreclosed on the collateral on July 5, 1988, but did
not sell the property until December 31, 1992. Therefore, the key lies in determining the nature
of the RTC's interest in the collateral as of the foreclosure date. (2) An analysis of the Participation
Agreement is crucial to this determination because "[t]he terms of the participation agreement .
. . govern the participation relationship . . . ." Franklin v. Commissioner of Internal Revenue,
683 F.2d 125, 128 (5th Cir. 1982) (citation omitted).

 Courts and legal scholars debate the correct characterization of the relationship
between the lead bank, which makes the loan to the borrower, and the participating bank. This
relationship determines the nature of the loan participant's interest in the loan and the underlying
collateral. While we are aware of no Texas case dealing with the interests of a participant in the
collateral securing a participated loan, we find guidance in legal scholarship and in the opinions
of courts in other jurisdictions. 

 The minority position "treats the participation as a loan by the participant to the
lead lender." Bradford Anderson, Loan Participations and the Borrower's Bankruptcy, 64 Am.
Bankr. L.J. 39, 40 (1990). According to this view, the participant has an ownership interest in
collections only--that is, the participant's pro rata share of all loan payments of principal or
interest. (3) See, e.g., In re Alda Commercial Corp., 327 F. Supp. 1315, 1317 (S.D.N.Y. 1971)
(concluding that the relationship between the participant and lead bank "more closely resembled
that of lender and borrower"); First Nat'l Bank v. Clay-Hensley Comm'n Co., 525 N.E.2d 217,
221, 221-22 (Ill. App. Ct. 1988) (determining that the "participant's partial and undivided interest
in the borrower's note and underlying collateral represents its security for a loan it really makes
to the lead [bank]" and holding that the participant "has no interest in or right to possession of the
collateral such that it may properly bring a cause of action for conversion"). 

 The majority view--and the view we choose to follow--classifies a participation as
"a complete transfer of ownership interest in the loan and collateral to the participant." Anderson,
supra, at 40.


The arguments for the beneficiary-trustee characterization of the . . . relationship
[between the participant and lead bank] appear stronger than the arguments
favoring the creditor-debtor relationship. A participant's decision to invest in a
given loan transaction will ordinarily be based upon its determination of (a) the
creditworthiness of the underlying borrower, (b) the quality of the collateral, (c)
the terms of the underlying loan, (d) the financial terms of the proposed
participation arrangement, (e) the recommendation of the transaction by the lead
lender and (f) the experience and reputation of the lead lender.



In re Woodson Co., 813 F.2d 266, 271 (9th Cir. 1987) (quoting L. Clerkis, Collier Real Estate
Transactions and the Bankruptcy Code ¶ 4.05[3] (1984)). Under this view, the participant has an
ownership or trust interest in the loan and underlying collateral, not just in the collections from
the loan. See, e.g., Franklin, 683 F.2d at 128 n.9 (holding that under the terms of the
participation agreement, "the participant is an assignee of a percentage interest of the loan and the
lead bank is the agent for servicing the entire loan"); Jefferson Sav. & Loan Ass'n v. Lifetime Sav.
& Loan Ass'n, 396 F.2d 21, 24 (5th Cir. 1968) (holding that when the lead bank purchased the
collateral securing the participated loan at the trustee's sale, the participant was a "co-tenant" with
the lead bank and "the beneficiary of the trust"); In re Drexel Burnham Lambert Group Inc., 113
B.R. 830, 843, 842-44 (Bankr. S.D.N.Y. 1990) ("The lead bank, by participating the loan,
assigns, transfers, and conveys an undivided percentage ownership interest in the collateral for
the participated loan to the participant. . . . Accordingly, the loan participants are entitled to their
shares as beneficiaries of a trust.") (emphasis added); Mark E. MacDonald, Loan Participations
As Enforceable Property Rights in Bankruptcy--A Reply to the Trustee's Attack, 53 Am. Bankr.
L.J. 35, 39, 41 n.13, 38-43 (1979) (characterizing the participant as a "beneficial owner" and "an
undivided co-owner of the loans in question" and explaining that "[a] partial assignment of a note
and mortgage makes the participant a tenant in common of the mortgage security") (emphasis
added); David B. Simpson, Loan Participations: Pitfalls for Participants, 31 Bus. Law. 1977,
1977 (1976) ("Where a loan is collateralized by real estate . . . , the participation will normally
include the transfer of an undivided interest in the underlying collateral.").

 The majority position recognizes that the law germane to participations originates
in substantial part from the law of assignments. See Anderson, supra, at 40 n.5, 40-45 (noting
that the typical participation agreement "creates, in effect, a partial assignment, usually coupled
with either an agency or trust to collect and remit the loan proceeds"). Accordingly, not only
does the participant have a right to share in the proceeds of the loan; it also has a percentage
ownership interest in the underlying loan. See 4 John N. Pomeroy, A Treatise on Equity
Jurisprudence § 1280 (The Lawyers Co-operative Publishing Co. 1941) (1905) ("The doctrine that
the equitable assignee obtains, not simply a right of action against the . . . debtor, but an equitable
property in the fund itself, is carried out into all of its legitimate consequences."). It follows that
if a participant has a percentage ownership in the underlying loan, it also shares a percentage
ownership of the collateral securing the loan. See Batesville Inst. v. Kauffman, 85 U.S. 151, 154
(1873) ("If a part only of the debt is assigned, a pro tanto portion of the security follows it.");
Peter F. Coogan, Homer Kripke, and Frederic Weiss, The Outer Fringes of Article 9: Security
Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements, 79
Harv. L. Rev. 229, 271 (1965) ("It is the present writers' conclusion that assignment of the basic
note carries with it as a matter of law the security interest in the collateral for the note.")
(emphasis in original).

 Even courts that follow the majority position have recognized, however, that some
"participation" transactions may more closely resemble lending arrangements. "Simply calling
transactions [participation] sales does not make them so. Labels cannot change the true nature of
the underlying transactions." In re Woodson, 813 F.2d at 272. The court in Woodson, for
instance, determined that the participation transaction at issue differed from the typical
participation transaction in one important aspect: it relieved the participant-investors of all risk
of loss. "This . . . feature seems to result in a finding of a debtor-creditor relationship in most
cases." Id. at 271. See also S.O.A.W. Enter., Inc., 32 B.R. 279, 282 (Bankr. W.D. Tex. 1983)
(finding that where the "participant" bank was entitled to receive 100% of all payments the
borrowers made to the "lead" until it received its entire 30% share, the transactions were
disguised loans rather than participation interests); Bernard v. Fireside Commercial Life Ins. Co.,
633 So. 2d 177, 188 (La. Ct. App. 1993) ("[A] true participation envisions the parties sharing pro
rata not only in the benefits of the underlying loan, but also in its risks."). 

 We have determined that the Participation Agreement in the present case transferred
an ownership interest in the underlying loan and collateral to the participant; it did not convert
the lead-participant relationship into a debtor-creditor relationship. The Participation Agreement
clearly states that the participant has "agreed to purchase a participation in" the Pond Springs
loan. (Emphasis added.) It additionally declares: "No amount paid by the Participant to purchase
any participation in the obligations of the Borrower under the Loan Papers shall be considered a
loan by the Participant to the Bank." Furthermore, the terms of the Participation Agreement are
consistent with the characterization of this transaction as a sale or assignment. The Agreement
provides: "Except as expressly provided herein to the contrary, all rights pursuant to the Loan
Papers or otherwise and all collateral held by the Bank to secure payment of the obligations . .
. shall be exercised[] for the ratable benefit of the Bank and the Participant (collectively, the
`Lenders')." (Emphasis added.) It further states that any other sums to be applied to the
borrowers obligations under the loan papers shall be shared by the lead bank and participant and
that nothing in the agreement "shall be deemed . . . to relieve either of the Lenders from
absorbing its Pro Rata Part of any losses sustained" with respect to borrower's obligations under
the loan. Additionally, the Agreement provides that the lead bank has "no obligation to
repurchase the participations . . . upon any default by the Borrower." (4)

 Asset Restructuring contends that paragraph 9 of the Participation Agreement
expressly provides that the participant has no interest in the underlying collateral. The provision
states:


Without limiting rights to which the Participant otherwise is or may become
entitled, by virtue of this agreement and the Participant's rights hereunder, the
Participant shall have no interest in . . . (e) any property now or hereafter in the
possession or control of the Bank which may be or become security for the
obligations of the Borrower arising under any Loan Papers by reason of the general
description of indebtedness secured or of property contained in any other
agreements, documents, or instruments related to any such other financings.



In its response to the RTC's reply brief, Asset Restructuring interprets this provision as
designating the participating bank a "passive investor in the benefit, or loss, represented by the
Loan." The RTC responds by pointing out that Asset Restructuring took paragraph 9(e) of the
Agreement out of context. The RTC contends that "[t]he clear intent of Paragraph 9 is to exclude
the Participant from any collateral granted to the Lead Bank by virtue of other financings between
the Lead Bank and the Borrower." (Emphasis in original.) Paragraph 9(a) defines the term "other
financings" to mean: "any present or future loans from, letters of credit issued by, or leasing or
other financing transactions . . . by the Bank to . . . the Borrower other than the credit facilities
provided for under the Loan Agreement . . . ." Thus, the RTC explains, "[t]he clear intent of
Paragraph 9(e) read in context is to preclude the Participant from claiming any entitlement to the
benefits of any blanket clauses in loan documents related to other financings that the Lead Bank
has with the Borrower if the Loan goes into default." Given the content of the entire Participation
Agreement, we find the RTC's interpretation of paragraph 9(e) persuasive.

 We thus hold that when the Pond Springs loan went into default and foreclosure
occurred, the RTC as participant held an undivided ownership interest in the collateral foreclosed
upon. (5) The Jefferson Savings case, the only reported case addressing lead and participant banks'
ownership interests in collateral following foreclosure, follows the majority position and thus
provides direction for this Court. The Ninth Circuit concluded that a participant holds equitable
title and an ownership interest in former collateral in amounts equal to the extent to which each
had funded the loan. Jefferson Savings, 396 F.2d at 24. 

 When the borrower defaulted on the Pond Springs loan and Liberty National Bank
foreclosed on the collateral securing the loan, the RTC "acquired" its pro rata interest in the
collateral. Since this foreclosure took place before the closing date of October 6, 1992, the
collateral falls within the reservation clause of the Bill of Sale, and the RTC did not convey the
collateral to Asset Restructuring. Because we have decided that the collateral falls within the
reservation clause of the Bill of Sale, it is unnecessary to determine whether the RTC absolutely
sold its entire interest in the loan to the Asset Restructuring or merely sold it a loan deficiency. 
Therefore, the trial court correctly found as a matter of law that the RTC owned the cash proceeds
of the sale and proceeds of the Note if and when paid. We overrule both of Asset Restructuring's
points of error and affirm the trial-court judgment.



Before Chief Justice Carroll, Justices Jones and Kidd; Chief Justice Carroll Not Participating


Affirmed


Filed: October 26, 1994


Publish

1. Whether a contract is ambiguous is a question of law. R & P Enters. v. LaGuarta,
Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980). If a contract is so worded that it can
be given a certain and definite meaning or interpretation, it is not ambiguous. Alba Tool &
Supply Co. v. Industrial Contractors, Inc., 585 S.W.2d 662, 664 (Tex. 1979); Universal
C.I.T. Credit Corp. v. Daniel, 243 S.W.2d 154, 157 (Tex. 1951). A writing is ambiguous
only when, after application of pertinent rules of interpretation, the face of the writing
indicates genuine uncertainty as to which meaning of its terms is proper. Capitol Rod & Gun
Club v. Lower Colo. River Auth., 622 S.W.2d 887, 894 (Tex. App.--Austin 1981, writ ref'd
n.r.e.).
2. Asset Restructuring concedes that if the property had been sold by Liberty National Bank
before October 6, 1992, the collateral would fall within the reservation clause as property
otherwise acquired by the seller, and the proceeds of the sale would belong to the RTC. In its
brief, Asset Restructuring states, "Prior to executing the Bill of Sale, the Participating Bank
owned an interest in the payment and proceeds generated by the Loan including proceeds
collected through the sale of collateral securing the loan by the Lead Bank." (Emphasis in
original.) However, since Liberty National Bank had not yet sold the property, Asset
Restructuring contends that the RTC had no interest in the collateral. According to Asset
Restructuring, the RTC did not have an ownership interest in the former collateral because
Liberty National as the lead bank had sole authority to foreclose. We disagree. The power to
foreclose does not determine the ownership of the property after foreclosure. 
3. Asset Restructuring claims in its brief that the RTC as participant "was not a creditor of
the Borrower, but was to receive a share of the participated Loan's cash flow if and when
received. . . ." 
4. In distinguishing between a trust relationship and a debtor-creditor relationship, Mark
MacDonald explains:


 Another indication of a trust, rather than a debtor-creditor,
relationship is found where the trustee is not held liable to the
beneficiary if the subject matter of the trust is lost or rendered
uncollectible without the fault of the trustee. By contrast, if
money lent is lost by a debtor, the debt is not thereby discharged.


MacDonald, supra, at 61.
5. We decline to settle the exact type of interest a participant bank has in the underlying
collateral of a participated loan. It is sufficient for us to recognize that the RTC possessed at
least an equitable ownership interest in the collateral securing the Pond Springs loan pursuant
to the Participation Agreement and that as such the foreclosed collateral falls within the
"otherwise acquired" language of the reservation clause.