**ASSET RESTRUCTURING FUND, L.P., Appellant,**

v.

**LIBERTY NATIONAL BANK AND RESOLUTION TRUST CORPORATION, as Receiver for Capital City Federal Savings Association, Appellees.**

No. 3–93–615–CV.

Court of Appeals of Texas, Austin.

Oct. 26, 1994.

Rehearing Overruled Dec. 7, 1994.

Roger Moore, Gray & Becker, Austin, J.D. Humphries, III, Varner, Stephens, Wingfield & Humphries, Atlanta, GA, for appellant.

Michael Shaunessy, Bickerstaff, Heath & Smiley, L.L.P., Austin, for Resolution Trust Corp.

Before CARROLL, C.J., and JONES and KIDD, JJ.

PER CURIAM.

Appellant Asset Restructuring Fund, L.P. ("Asset Restructuring"), appeals from a summary judgment granted in favor of appellee Resolution Trust Corporation (the "RTC"). This case involves conflicting claims to funds deposited with the trial court. The court granted the RTC's motion for summary judgment, ruling, as a matter of law, that the RTC owned the funds in controversy. In two points of error, Asset Restructuring contends that the trial court erred in granting the RTC's motion for summary judgment and denying Asset Restructuring's motion for summary judgment because the RTC conveyed its interest in the funds to Asset Restructuring by an "absolute" bill of sale. We will affirm the trial-court judgment.

## BACKGROUND

On November 8, 1985, Congress National Bank entered into a Loan Participation Agreement (the "Participation Agreement") with Capital City Savings. In a typical loan participation transaction, a lead bank sells to a participating bank (the "participant") a percentage of a loan that has been made to a third party. In this case, Congress National, the lead bank, made a loan to Pond Springs Joint Venture (the "Pond Springs loan"). Capital City Savings, the participating bank, purchased an undivided 58.73% interest in the loan (the "participation"). Liberty National Bank, through a series of transactions, succeeded to the interest of Congress National Bank under the Participation Agreement and became the lead bank. The RTC, as receiver for Capital City Federal Savings Association, succeeded to Capital City Savings' interest under the Participation Agreement and became the participant.

Pond Springs Joint Venture defaulted on its loan. When a borrower defaults on a loan, the lender has a right to foreclose on the collateral securing the loan; thus, on July 5, 1988, Liberty National Bank foreclosed on the collateral securing the Pond Springs loan. Several years after the foreclosure but before Liberty National Bank had sold the collateral securing the Pond Springs loan, the RTC sold its 58.73% interest under the Participation Agreement to Asset Restructuring by Bill of Sale and Assignment of Loans dated October 14, 1992 (the "Bill of Sale"). On December 31, 1992, Liberty National Bank sold the collateral for the Pond Springs loan for $57,914.75 in cash and a $560,000.00 note (the "Note"). After the dispute between the RTC and Asset Restructuring arose, Liberty National Bank also received $18,213.48 in proceeds of an escrow account for taxes and insurance on the collateral, $18,290.09 in rental proceeds from the collateral, and interest and principal payments on the Note.

According to the Participation Agreement, Liberty National Bank, as lead bank, is enti-

tled to 41.27% of all cash proceeds from the sale of the collateral—$38,966.44—and 41.27% of the payments on the Note as and when paid. Both the RTC and Asset Restructuring claim the right to the remaining 58.73% of the cash proceeds of the sale and payments received on the Note. Liberty National Bank filed an interpleader and deposited the remaining $58,338.14 and 58.73% of the future payments on the Note with the trial court. The trial court granted the RTC's motion for summary judgment, finding that, as a matter of law, the RTC is the rightful owner of the money and other property made the basis of the interpleader action.

## DISCUSSION

■ We must determine whether the trial court correctly granted the RTC's motion for summary judgment on the basis that the RTC owned the funds in controversy as a matter of law. The standards for reviewing a motion for summary judgment are well established: (1) The movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ This case revolves solely around the legal interpretation of two contracts: the Participation Agreement and the Bill of Sale. Texas courts have long held that the interpretation of an unambiguous contract is a question of law that is proper for summary judgment. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962). Neither party contends that the

Participation Agreement or the Bill of Sale is ambiguous, and we conclude that they are unambiguous.[1] The trial court, therefore, correctly disposed of the case on summary judgment. The sole issue before this Court is whether the trial court accurately interpreted the documents in finding that the RTC owned the proceeds from the collateral. Because unambiguous contracts are to be construed as a matter of law, we need not defer to the trial court's interpretation of the documents. *See Maxfield v. Northwood Homes, Inc.*, 582 S.W.2d 588, 589 (Tex.Civ. App.—Dallas 1979, writ ref'd n.r.e.).

■ The pivotal document in this case is the Bill of Sale. Pursuant to the Bill of Sale, the RTC "absolutely s[old], transfer[red], assign[ed], set[ ]-over, and convey[ed]" to Asset Restructuring:

> (a) all of Assignor's right, title and interest in and to each of the loans identified in the loan schedule attached hereto …, together with all promissory notes or other evidence of indebtedness, if any, and together with … all collateral … pledged in connection therewith, if any; …
>
> (b) …. *provided, however, that Seller shall retain all right, title and interest in and to any and all items of Collateral which, prior to the Closing Date [October 6, 1992], may have been foreclosed upon or otherwise acquired by Seller.* …

(Emphasis added.) Asset Restructuring contends that paragraph (a) of the Bill of Sale (the "granting clause") "absolutely" conveyed to it the RTC's entire interest in the Pond Springs loan and the underlying collateral and that paragraph (b) (the "reservation clause") does not apply because the RTC never possessed any "collateral" upon which it could foreclose. The RTC, on the other hand, claims that it sold Asset Restructuring only a loan deficiency—that is, the remaining loan balance after applying the amount of the bid at the public foreclosure sale; this loan

---

1. Whether a contract is ambiguous is a question of law. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). If a contract is so worded that it can be given a certain and definite meaning or interpretation, it is not ambiguous. *Alba Tool & Supply Co. v. Industrial Contractors, Inc.*, 585 S.W.2d 662, 664 (Tex.1979); *Universal C.I.T. Credit Corp. v. Dan-*

*iel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). A writing is ambiguous only when, after application of pertinent rules of interpretation, the face of the writing indicates genuine uncertainty as to which meaning of its terms is proper. *Capitol Rod & Gun Club v. Lower Colo. River Auth.*, 622 S.W.2d 887, 894 (Tex.App.—Austin 1981, writ ref'd n.r.e.).

deficiency excluded the RTC's interest in the collateral. Alternatively, the RTC contends that the Pond Springs loan collateral falls within the reservation clause as "collateral ... foreclosed upon or otherwise acquired by Seller" and, thus, was not conveyed to Asset Restructuring by the Bill of Sale. Asset Restructuring responds that, even if the reservation clause applies in this case because the RTC had an interest in the collateral, the Court should not give effect to paragraph (b) because it conflicts with the absolute conveyance made in the granting clause. According to Asset Restructuring, when a granting clause and another clause in a conveyance conflict, the granting clause must necessarily control. We disagree. If the provisions in a contract do not contradict one another, the contract should be construed in its entirety so as to give effect to all its provisions and not render any provision meaningless. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex.1980); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157–58 (1951). In the present case, paragraphs (a) and (b) of the Bill of Sale when read together can both be given effect without contradiction. The "provided however" language of the reservation clause makes clear that the parties intended to restrict the absolute scope of the granting clause. *See Knight v. Chicago Corp.,* 144 Tex. 98, 188 S.W.2d 564, 566 (1945) (noting that the essential meaning of "provided however" is " 'but notwithstanding what is granted above' ").

In order to determine whether the Bill of Sale conveyed the collateral securing the Pond Springs loan to Asset Restructuring, we must determine whether the RTC had foreclosed upon or otherwise acquired the collateral before October 6, 1992, within the terms of the reservation clause. Liberty National Bank foreclosed on the collateral on July 5, 1988, but did not sell the property until December 31, 1992. Therefore, the key lies in determining the nature of the RTC's interest in the collateral as of the foreclosure date.[2] An analysis of the Participation Agreement is crucial to this determination because "[t]he terms of the participation agreement ... govern the participation relationship...." *Franklin v. Commissioner of Internal Revenue,* 683 F.2d 125, 128 (5th Cir.1982) (citation omitted).

Courts and legal scholars debate the correct characterization of the relationship between the lead bank, which makes the loan to the borrower, and the participating bank. This relationship determines the nature of the loan participant's interest in the loan and the underlying collateral. While we are aware of no Texas case dealing with the interests of a participant in the collateral securing a participated loan, we find guidance in legal scholarship and in the opinions of courts in other jurisdictions.

The minority position "treats the participation as a loan by the participant to the lead lender." Bradford Anderson, *Loan Participations and the Borrower's Bankruptcy,* 64 Am.Bankr.L.J. 39, 40 (1990). According to this view, the participant has an ownership interest in collections only—that is, the participant's pro rata share of all loan payments of principal or interest.[3] *See, e.g., In re Alda Commercial Corp.,* 327 F.Supp. 1315, 1317 (S.D.N.Y.1971) (concluding that the relationship between the participant and lead bank "more closely resembled that of lender and borrower"); *First Nat'l Bank v.*

---

**2.** Asset Restructuring concedes that if the property had been sold by Liberty National Bank before October 6, 1992, the collateral would fall within the reservation clause as property otherwise acquired by the seller, and the proceeds of the sale would belong to the RTC. In its brief, Asset Restructuring states, "Prior to executing the Bill of Sale, the Participating Bank owned an interest *in the payment and proceeds* generated by the Loan including proceeds collected through the sale of collateral securing the loan by the Lead Bank." (Emphasis in original.) However, since Liberty National Bank had not yet sold the property, Asset Restructuring contends that the RTC had no interest in the collateral. According to to Asset Restructuring, the RTC did not have an ownership interest in the former collateral because Liberty National as the lead bank had sole authority to foreclose. We disagree. The power to foreclose does not determine the ownership of the property after foreclosure.

**3.** Asset Restructuring claims in its brief that the RTC as participant "was not a creditor of the Borrower, but was to receive a share of the participated Loan's cash flow if and when received...."

*Clay–Hensley Comm'n Co.,* 170 Ill.App.3d 898, 121 Ill.Dec. 411, 415, 415–16, 525 N.E.2d 217, 221, 221–22 (1988) (determining that the "participant's partial and undivided interest in the borrower's note and underlying collateral represents its security for a loan it really makes to the lead [bank]" and holding that the participant "has no interest in or right to possession of the collateral such that it may properly bring a cause of action for conversion").

The majority view—and the view we choose to follow—classifies a participation as "a complete transfer of ownership interest in the loan and collateral to the participant." Anderson, *supra,* at 40.

> The arguments for the beneficiary-trustee characterization of the ... relationship [between the participant and lead bank] appear stronger than the arguments favoring the creditor-debtor relationship. A participant's decision to invest in a given loan transaction will ordinarily be based upon its determination of (a) the creditworthiness of the underlying borrower, (b) the quality of the collateral, (c) the terms of the underlying loan, (d) the financial terms of the proposed participation arrangement, (e) the recommendation of the transaction by the lead lender and (f) the experience and reputation of the lead lender.

*In re Woodson Co.,* 813 F.2d 266, 271 (9th Cir.1987) (quoting L. Clerkis, *Collier Real Estate Transactions and the Bankruptcy Code* ¶ 4.05[3] (1984)). Under this view, the participant has an ownership or trust interest in the loan and underlying collateral, not just in the collections from the loan. *See, e.g., Franklin,* 683 F.2d at 128 n. 9 (holding that under the terms of the participation agreement, "the participant is an assignee of a percentage interest of the loan and the lead bank is the agent for servicing the entire loan"); *Jefferson Sav. & Loan Ass'n v. Lifetime Sav. & Loan Ass'n,* 396 F.2d 21, 24 (9th Cir.1968) (holding that when the lead bank purchased the collateral securing the participated loan at the trustee's sale, the participant was a "co-tenant" with the lead bank and "the beneficiary of the trust"); *In re Drexel Burnham Lambert Group Inc.,* 113 B.R. 830, 843, 842–44 (Bankr.S.D.N.Y.1990)

("The lead bank, by participating the loan, assigns, transfers, and conveys an *undivided percentage ownership interest in the collateral* for the participated loan to the participant. . . . Accordingly, the loan participants are entitled to their shares as beneficiaries of a trust.") (emphasis added); Mark E. MacDonald, *Loan Participations As Enforceable Property Rights in Bankruptcy—A Reply to the Trustee's Attack,* 53 Am.Bankr.L.J. 35, 39, 41 n. 13, 38–43 (1979) (characterizing the participant as a "beneficial owner" and "an undivided *co-owner* of the loans in question" and explaining that "[a] partial assignment of a note and mortgage makes the participant a *tenant in common* of the mortgage security") (emphasis added); David B. Simpson, *Loan Participations: Pitfalls for Participants,* 31 Bus.Law. 1977, 1977 (1976) ("Where a loan is collateralized by real estate . . ., the participation will normally include the transfer of an undivided interest in the underlying collateral.").

The majority position recognizes that the law germane to participations originates in substantial part from the law of assignments. *See* Anderson, *supra,* at 40 n. 5, 40–45 (noting that the typical participation agreement "creates, in effect, a partial assignment, usually coupled with either an agency or trust to collect and remit the loan proceeds"). Accordingly, not only does the participant have a right to share in the proceeds of the loan; it also has a percentage ownership interest in the underlying loan. *See* 4 John N. Pomeroy, A Treatise on Equity Jurisprudence § 1280 (The Lawyers Co-operative Publishing Co. 1941) (1905) ("The doctrine that the equitable assignee obtains, not simply a right of action against the ... debtor, but an equitable property in the fund itself, is carried out into all of its legitimate consequences."). It follows that if a participant has a percentage ownership in the underlying loan, it also shares a percentage ownership of the collateral securing the loan. *See Batesville Inst. v. Kauffman,* 85 U.S. (18 Wall.) 151, 154, 21 L.Ed. 775 (1873) ("If a part only of the debt is assigned, a *pro tanto* portion of the security follows it."); Peter F. Coogan, Homer Kripke, and Frederic Weiss, *The Outer Fringes of Article 9: Security Interests in Money and Deposits, Negative Pledge Claus-*

*es, and Participation Agreements,* 79 Harv. L.Rev. 229, 271 (1965) ("It is the present writers' conclusion that assignment of the basic note carries with it *as a matter of law* the security interest in the collateral for the note.") (emphasis in original).

Even courts that follow the majority position have recognized, however, that some "participation" transactions may more closely resemble lending arrangements. "Simply calling transactions [participation] sales does not make them so. Labels cannot change the true nature of the underlying transactions." *In re Woodson,* 813 F.2d at 272. The court in *Woodson,* for instance, determined that the participation transaction at issue differed from the typical participation transaction in one important aspect: it relieved the participant-investors of all risk of loss. "This ... feature seems to result in a finding of a debtor-creditor relationship in most cases." *Id.* at 271. *See also S.O.A.W. Enter., Inc.,* 32 B.R. 279, 282 (Bankr. W.D.Tex.1983) (finding that where the "participant" bank was entitled to receive 100% of all payments the borrowers made to the "lead" until it received its entire 30% share, the transactions were disguised loans rather than participation interests); *Bernard v. Fireside Commercial Life Ins. Co.,* 633 So.2d 177, 188 (La.Ct.App.1993) ("[A] true participation envisions the parties sharing pro rata not only in the benefits of the underlying loan, but also in its risks.").

■ We have determined that the Participation Agreement in the present case transferred an ownership interest in the underlying loan and collateral to the participant; it did not convert the lead-participant relationship into a debtor-creditor relationship. The Participation Agreement clearly states that the participant has "agreed to *purchase* a participation in" the Pond Springs loan. (Emphasis added.) It additionally declares: "No amount paid by the Participant to purchase any participation in the obligations of the Borrower under the Loan Papers shall

be considered a loan by the Participant to the Bank." Furthermore, the terms of the Participation Agreement are consistent with the characterization of this transaction as a sale or assignment. The Agreement provides: "Except as expressly provided herein to the contrary, all rights pursuant to the Loan Papers or otherwise and *all collateral held by the Bank to secure payment of the obligations* ... shall be exercised[ ] for the *ratable benefit of the Bank and the Participant* (collectively, the 'Lenders')." (Emphasis added.) It further states that any other sums to be applied to the borrowers obligations under the loan papers shall be shared by the lead bank and participant and that nothing in the agreement "shall be deemed ... to relieve either of the Lenders from absorbing its Pro Rata Part of any losses sustained" with respect to borrower's obligations under the loan. Additionally, the Agreement provides that the lead bank has "no obligation to repurchase the participations ... upon any default by the Borrower."[4]

Asset Restructuring contends that paragraph 9 of the Participation Agreement expressly provides that the participant has no interest in the underlying collateral. The provision states:

Without limiting rights to which the Participant otherwise is or may become entitled, by virtue of this agreement and the Participant's rights hereunder, the Participant shall have no interest in ... (e) any property now or hereafter in the possession or *control of the Bank which may be* or become security for the obligations of the Borrower arising under any Loan Papers by reason of the general description of indebtedness secured or of property contained in any other agreements, documents, or instruments related to any such other financings.

In its response to the RTC's reply brief, Asset Restructuring interprets this provision

---

4. In distinguishing between a trust relationship and a debtor-creditor relationship, Mark Mac-Donald explains:

Another indication of a trust, rather than a debtor-creditor, relationship is found where the trustee is not held liable to the beneficiary

if the subject matter of the trust is lost or rendered uncollectible without the fault of the trustee. By contrast, if money lent is lost by a debtor, the debt is not thereby discharged.

MacDonald, *supra,* at 61.

as designating the participating bank a "passive investor in the benefit, or loss, represented by the Loan." The RTC responds by pointing out that Asset Restructuring took paragraph 9(e) of the Agreement out of context. The RTC contends that "[t]he clear intent of Paragraph 9 is to exclude the Participant from any collateral granted to the Lead Bank by virtue of *other financings* between the Lead Bank and the Borrower." (Emphasis in original.) Paragraph 9(a) defines the term "other financings" to mean: "any present or future loans from, letters of credit issued by, or leasing or other financing transactions ... by the Bank to ... the Borrower other than the credit facilities provided for under the Loan Agreement...." Thus, the RTC explains, "[t]he clear intent of Paragraph 9(e) read in context is to preclude the Participant from claiming any entitlement to the benefits of any blanket clauses in loan documents related to other financings that the Lead Bank has with the Borrower if the Loan goes into default." Given the content of the entire Participation Agreement, we find the RTC's interpretation of paragraph 9(e) persuasive.

We thus hold that when the Pond Springs loan went into default and foreclosure occurred, the RTC as participant held an undivided ownership interest in the collateral foreclosed upon.[5] The *Jefferson Savings* case, the only reported case addressing lead and participant banks' ownership interests in collateral following foreclosure, follows the majority position and thus provides direction for this Court. The Ninth Circuit concluded that a participant holds equitable title and an ownership interest in former collateral in amounts equal to the extent to which each had funded the loan. *Jefferson Savings*, 396 F.2d at 24.

█ When the borrower defaulted on the Pond Springs loan and Liberty National Bank foreclosed on the collateral securing the loan, the RTC "acquired" its pro rata interest in the collateral. Since this foreclosure took place before the closing date of

October 6, 1992, the collateral falls within the reservation clause of the Bill of Sale, and the RTC did not convey the collateral to Asset Restructuring. Because we have decided that the collateral falls within the reservation clause of the Bill of Sale, it is unnecessary to determine whether the RTC absolutely sold its entire interest in the loan to the Asset Restructuring or merely sold it a loan deficiency. Therefore, the trial court correctly found as a matter of law that the RTC owned the cash proceeds of the sale and proceeds of the Note if and when paid. We overrule both of Asset Restructuring's points of error and affirm the trial-court judgment.

Affirmed.

CARROLL, C.J., not participating.

---

5. We decline to settle the exact type of interest a participant bank has in the underlying collateral of a participated loan. It is sufficient for us to recognize that the RTC possessed at least an equitable ownership interest in the collateral se-

curing the Pond Springs loan pursuant to the Participation Agreement and that as such the foreclosed collateral falls within the "otherwise acquired" language of the reservation clause.