TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00279-CV






JBV Inc. and Trav-Tex Development Co., Appellants



v.



Carolyn Esther Barkley, Janet Sue Barkley-Booher, Barkley Family Farm


Partnership, Edward M. Barkley Marital Trust, and Estate


of Edward M. Barkley, Deceased, Appellees



&





NO. 03-96-00350-CV






JBV Inc. and Trav-Tex Development Co., Appellants



v.



Edward M. Barkley, Carolyn E. Barkley, Janet S. Barkley-Booher, Edward M.


Barkley Marital Trust, Edward M. Barkley Family Trust and the


Barkley Family Farm Partnership, Appellees






FROM THE DISTRICT COURTS OF TRAVIS COUNTY, 53RD & 201ST JUDICIAL

DISTRICTS

NOS. 95-02127 & 95-07058, HONORABLE HUME COFER, JUDGE PRESIDING





 JBV Inc. and Trav-Tex Development Co. (collectively, "JBV") sued the Barkleys for
specific performance of a contract to purchase real estate owned by the Barkleys. After a jury found for
the Barkleys on their affirmative defenses, the trial court rendered judgment that JBV take nothing. In a
separate cause, the trial court granted the Barkleys' motion for summary judgment to award them $45,000
earnest money. JBV appeals both judgments in nine points of error. We must determine whether the trial
court erred in admitting evidence of agreements between the parties made prior and contemporaneously
to their signed written modifications to the contract. Because we conclude that the trial court properly
admitted the parol evidence and there is legally and factually sufficient evidence to support the jury's
verdict, we will affirm the trial court's judgment in Cause No. 03-96-279-CV. Because we find no error
of law and no genuine issue of fact regarding the earnest money, we will also affirm the summary judgment
in Cause No. 03-96-350-CV. (1)


THE CONTROVERSY

 After Edward M. Barkley passed away in 1994, his daughters Carolyn Barkley and Janet
Barkley-Booher had the task of selling 218.98 acres of land their father had owned near St. Elmo Road
in southeast Austin. Having little cash on hand with which to pay estate debts and taxes, they needed to
sell the land within six months. That June, after rejecting several offers to purchase over a longer period
of time, the Barkleys contracted to sell the property to two San Antonio-based corporations, JBV Inc. and
Trav-Tex Development Co. Joe Veytia was the president of JBV and Bud Johnson was in charge of Trav-Tex. The earnest money contract, signed on June 6, 1994, provided that JBV would pay $4.4 million for
the property--one million dollars down on or before November 30 of that year and the remaining $3.4
million to be financed by the Barkleys. JBV deposited $30,000 in earnest money with Commercial Title
Company on June 8 and an additional $15,000 on September 1. The buyers promised to provide the
Barkleys with credit information on JBV Inc., the financial backer, within ten days. On June 20, JBV sent
Veytia's personal credit report showing JBV Inc. was worth just over $64,000 but never provided the
Barkleys with a report showing JBV Inc.'s creditworthiness. Nevertheless, the Barkleys decided to
proceed with the contract. 

 After signing the earnest money contract, Veytia told the Barkleys he planned to find
another buyer for the property and expressed a desire to change the single-family zoned property to "light
industrial" use. On August 31 the parties executed a document they entitled "Addendum No. 1," which
included an affidavit signed by the Barkleys authorizing JBV to rezone the property (the "Zoning
Affidavit"). (2)

 Throughout September and October, Veytia and Johnson attempted unsuccessfully to find
a purchaser for the property. As time passed it appeared JBV would be unable to perform the contract--it
had neither provided credit reports nor applied for rezoning. In early October, the Barkleys attempted to
cancel the contract, but JBV insisted they were bound until November 30.

 On November 8, JBV assigned the contract to Southwest Property Group, which had the
right to inspect the property and to terminate the assignment on or before November 23. On November
17, JBV asked the Barkleys to extend the closing date of the contract. The next day the Barkleys
responded in a letter expressing their dismay at JBV's apparent inability to perform and suggesting three
alternatives to JBV: (1) they complete the transaction on November 30 as agreed; (2) they request and
pay for an extension; or (3) they allow the contract to expire on November 30 "and chalk the past 6
months up as a learning experience for both parties."

 On November 23, Southwest Properties Group terminated its assignment from JBV. The
next morning Veytia faxed the Barkleys a letter stating that one of its investors (later determined to be
Southwest Properties Group) was willing to pay $440,000 if the Barkleys would extend the closing date
of the contract for six months and suggesting additional terms for a modified contract. The Barkleys
responded on November 25 that they would accept payment for an extension but were unwilling to modify
the original contract in any other respect. At the seller's request, JBV submitted a draft constituting its
proposal to pay for the extension. The Barkleys consulted with their attorney, Don Flournoy, asking him
to be sure the $440,000 payment for extending the closing date would be in addition to the original
purchase price. Flournoy thought using a new form promulgated by the real estate commission would best
accomplish the Barkleys' objectives. Consequently, the Barkleys converted Veytia's proposal into two
separate documents which the parties would execute on November 30.

 The first document, entitled "Addendum No. 2," changed the closing date to May 31,
1995, allowed the earnest money to be used for rezoning expenses provided JBV applied for rezoning by
January 31, 1995, modified the financing terms, and allowed for assignment of the contract at closing. 
Addendum No. 2 did not mention any payment of consideration for the modified terms. The second
document, the "Option Addendum," stated:


in consideration of the NONREFUNDABLE sum of $440,000 paid by Buyer directly to
Seller, on or before 12:00 PM (noon) CST, December 2nd, 1994 . . ., Buyer shall have
the option to terminate the Contract by giving written notice of termination to Seller on or
before May 31, 1995 . . .



The Option Addendum further stated that the $440,000 would not be credited to the sales price at closing
and contained other terms not pertinent to this dispute. (3)

 During the negotiations, Veytia wrote the Barkleys that the $440,000 would be paid on
December 2 rather than November 30 because the money from his investor had to be wired from Canada. 
At first the Barkleys said they would not deal unless they received the money the same day they signed the
documents, but after consulting with their attorney, they agreed that "a mechanism can be worked out where
the title company acts as an exchange agent for a cashier's check and the signed documents to effect the
extension."

 On November 30, the parties met at Commercial Title Company and executed the three
addenda to the contract. After signing, they numbered by hand the twenty-one pages of the modified
contract, which included the original contract and the three addenda. Veytia then requested the Zoning
Affidavit. The Barkleys refused, telling Veytia he could not have the original until he had complied with the
terms of the contract. They then signed the affidavit in blue ink, noted on it that only the original signed in
blue ink was valid, and gave Veytia a copy instead. The Barkleys then gave the original affidavit and copies
of the modified contract to Wendy Butters of Commercial Title Company and instructed her not to release
the papers to Veytia unless she received a cashier's check for $440,000 on or before noon of December
2. Veytia never paid the money, and the Barkleys instructed Butters to return the documents to them.

 JBV subsequently attempted to use his copy of the Zoning Affidavit to initiate rezoning by
the city of Austin; the Barkleys instructed the city not to rezone and informed JBV that the contract had
expired when JBV failed to perform by November 30 or pay for an extension. (4) JBV insisted that the closing
date had been extended to May 31, 1995, but the Barkleys refused JBV's offer to close on May 31.

 JBV sued the Barkleys for specific performance of the contract and violations of the
Deceptive Trade Practices Act. The Barkleys pleaded as affirmative defenses lack of consideration, fraud
in the inducement, and non-delivery of the contract; they in turn countersued for DTPA violations. The trial
court submitted jury questions on fraud in the inducement and delivery of the contract. The jury found for
the Barkleys on both defensive issues. The trial court rendered judgment for the Barkleys and declared that
the original contract had expired and the extension agreement was invalid. In a separate interpleader
proceeding initiated by Commercial Title, the Barkleys filed a motion for summary judgment alleging they
were entitled to the $45,000 earnest money. The trial court granted the motion and awarded the Barkleys
the $45,000. JBV appeals both the take-nothing verdict and the summary judgment.


DISCUSSION

Jury Verdict

 JBV attacks various evidentiary rulings made by the trial court as well as the sufficiency of
the evidence supporting the jury verdict. We will address the evidentiary points of error first, as their
resolution will bear on the sufficiency points.

 In point of error one, JBV contends the trial court erroneously admitted evidence of the
negotiations that occurred prior and contemporaneously to the signing of the final written contract because
such evidence was inadmissible under the parol evidence rule. At trial, JBV claimed that the parties' final
written contract, specifically Addendum No. 2, evidenced the Barkleys' agreement to extend the closing
date without payment. (5) JBV contended it had an option to pay $440,000 on or before December 2, 1994
for the right to terminate the contract without penalty, as stated in the Option Addendum. (6) 

 The Barkleys, on the other hand, claimed that all three documents executed on November
30 were unenforceable because JBV fraudulently induced their signatures by promising to pay $440,000
it was incapable of paying and never intended to pay, or alternatively because the parties agreed the
documents would not become effective until JBV received the originals upon payment of $440,000.

 The complained-of evidence consists of the testimony and documentary exhibits showing
that Veytia offered to pay $440,000 for extending the contract and that the documents were not to become
effective until Butters gave the originals to Veytia in exchange for the money. At the conclusion of evidence
the trial court submitted to the jury the following defensive issues:


Question 1: At Commercial Title Company's office on November 30, 1994 did Joe
Veytia and B.L. Johnson make an oral agreement with the Barkleys that
none of the documents signed on that date would be in effect unless and until
Joe Veytia was given actual possession of those original documents signed
in ink on November 30?


Question 2: Did Joe Veytia make an oral promise that he would pay the Barkleys
$440,000 if they would sign the November 30 documents? 


Question 3: Was such promise, if any you find in answering question 3 [sic: 2], fraud? 
In answering this question consider the following definition of fraud. Fraud
occurs when 



 a. a party makes a material promise of future performance with an intent
not to perform as promised, and


 b. the promise is made with knowledge of its falsity, and


 c. the promise is made with the intention that it should be acted on by the
other party, and 


 d. the other party acts in reliance on the promise and thereby suffered
injury.



The jury answered each question affirmatively. 

 Evidence of prior or contemporaneous agreements is ordinarily inadmissible to add to, vary,
or contradict the terms of an unambiguous written contract intended by the parties to be the final expression
of their agreement. See Tracy v. Annie's Attic, Inc., 840 S.W.2d 527, 532 (Tex. App--Tyler 1992, writ
denied); Smith v. Smith, 794 S.W.2d 823, 827 (Tex. App.--Dallas 1990, writ withdrawn); Pan
American Bank of Brownsville v. Nowland, 650 S.W.2d 879, 885 (Tex. App.--San Antonio 1983, writ
ref'd n.r.e.). However, parol evidence is admissible to show (1) that the execution of the written agreement
was procured by fraud, (2) that an agreement was not to become effective except upon certain conditions
or contingencies, or (3) to ascertain the parties' true intentions when a writing is ambiguous. Isenhower
v. Bell, 365 S.W.2d 354, 359 (Tex. 1963); Baker v. Baker, 183 S.W.2d 724, 728 (Tex. 1944); Litton
v. Hanley, 823 S.W.2d 428, 430 (Tex. App.--Houston [1st Dist.] 1992, no writ). Any inadmissible
testimony, objected to or not, is "without probative force and will not support any finding." Hartford Ins.
Co. v. Commerce & Industry Ins. Co., 864 S.W.2d 648, 650 (Tex. App.--Houston [1st Dist.] 1993,
writ denied); Huddleston v. Fergeson, 564 S.W.2d 448, 452 (Tex. Civ. App.--Amarillo 1978, no writ).

 We review a trial court's decision to admit or exclude evidence under an abuse of discretion
standard. Jackson v. Van Winkle, 660 S.W.2d 807, 810 (Tex. 1983); Tracy, 840 S.W.2d at 531;
Syndex Corp. v. Dean, 820 S.W.2d 869, 873 (Tex. App.--Austin 1991, writ denied). Under this
standard, the trial court's action is erroneous only if we find that it acted without reference to any guiding
rules or principles. Downer v. Aqua Marine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985),
cert. denied, 476 U.S. 1159 (1986).

 The trial court ruled that the written contract was unambiguous. JBV contends it was error
for the court to delay its ruling on ambiguity until the end of trial after the jury had heard four and a half days
of parol testimony. However, when urged earlier to make its ruling, the trial court stated that the evidence
would still be admissible under the fraud in the inducement and condition precedent exceptions to the rule. 
We will therefore limit our inquiry to whether the evidence was admissible under either of these two
exceptions.

 The supreme court has held that parol evidence is always admissible to show the
nonexistence of a contract or the conditions upon which it may become effective. Baker, 183 S.W.2d at
728; Muhm v. Davis, 580 S.W.2d 98, 101 (Tex. Civ. App.--Houston [1st Dist.] 1979, writ ref'd n.r.e.). 
In Baker the plaintiff alleged that a release was conditionally executed and delivered to her attorney
subject to a contemporaneous oral agreement that the defendant would give her certain corporate stock. 
The supreme court held the parol testimony was admissible to show that the release was executed subject
to the agreement that it was not to become effective until the stock was delivered, as long as that condition
was not inconsistent with the written release. Baker, 183 S.W.2d at 728. Because there was nothing in
the release to prohibit the parties from making its effectiveness conditional on some occurrence, the
evidence of the parol agreement was admissible. Id. 

 The facts of the present case are nearly identical to those in Baker. The parol evidence
offered was that the parties agreed that the documents would be effective only when delivered to Veytia
upon his payment of $440,000. There is nothing in the written agreement that prevented making the
documents conditionally effective on this exchange. In addition, the Barkleys' fraudulent inducement
defense was inextricably related--the evidence showed a scheme by Veytia to obtain the Barkleys'
signatures before he had the money so that he could take the signed documents to his connections and get
the very money on which the documents' effectiveness was supposedly conditioned. We hold the trial
court did not abuse its discretion in admitting testimony to show that the documents were not effective.

 JBV argues that the Barkleys were required to show some sort of trickery, artifice, or
device in addition to the mere allegation of Veytia's misrepresentation. See Town North Nat'l Bank v.
Broaddus, 569 S.W.2d 489, 493 (Tex. 1978). Broaddus held that a maker seeking to avoid liability on
a promissory note must allege some sort of trickery, artifice, or device in addition to the allegation that the
payee misrepresented that another maker would carry the sole liability on the note. The supreme court held
that the additional showing was necessary in the promissory note context because otherwise one could
assert "any collateral parol agreement to contradict, vary, or even abrogate any written contract under the
guise of a fraudulent intent not to perform." Courts of appeals have confined Broaddus to the promissory
note context. See Coronado Transmission Co. v. O'Shea, 703 S.W.2d 731, 734 (Tex. App.--Corpus
Christi, writ ref'd n.r.e.); Wheeler v. Box, 671 S.W.2d 75, 76-77 (Tex. App.--Dallas 1984, no writ); see
also Barnes v. Weitzel, 678 S.W.2d 747, 751 (Tex. App.--Fort Worth 1984), rev'd, 691 S.W.2d 598,
600 (Tex. 1985). Apart from the fact that the evidence was admissible under the condition precedent
exception, Broaddus does not apply to this case involving protracted negotiations over the modification
of a real estate contract. Moreover, even if the Broaddus rule applied, the Barkleys' allegations amounted
to more than a mere misrepresentation and would have met even the more stringent test. See Coronado
Transmission Co., 703 S.W.2d at 734. We overrule the first point of error.

 In its third point of error, JBV claims the trial court abused its discretion by refusing to allow
testimony of Richard Melamed, an attorney board-certified in real estate law. The trial court sustained the
Barkleys' objection to the testimony on the ground that it was irrelevant. See Tex. R. Civ. P. 402. JBV
made a bill of exception in which Melamed testified on the law of offer and acceptance and the finality of
signed writings. He also gave his opinion on the proper way to extend the closing date of a real estate
contract and that the addenda executed by the parties did not reflect the Barkleys' allegation that $440,000
was to be paid as consideration for the extension of the contract's closing date. JBV contends the trial
court should have allowed Melamed's testimony to controvert the testimony given by the Barkleys'
attorney, Don Flournoy, and to allow the jury to blame the confusion on Flournoy's poor drafting rather
than on any wrongdoing by Veytia.

 Melamed's testimony was not relevant to the fact issues of whether the parties' written
agreement was conditioned on its delivery or whether Veytia induced the Barkleys into signing the
agreement by a misrepresentation. Flournoy's testimony was relevant to these issues because he was
involved in the transaction; Melamed, on the other hand, had no basis for personal knowledge concerning
the dispute and could not have contradicted Flournoy's testimony on a factual level. The trial court did not
abuse its discretion in excluding Melamed's testimony on questions of law concerning the interpretation of
the written agreement. See Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983); Asset Restructuring
Fund L.P. v. Liberty Nat'l Bank & Res. Trust Corp, 886 S.W.2d 548, 550 (Tex. App.--Austin 1994,
writ denied). We overrule point of error three.

 In point of error four, JBV contends the trial court failed to adequately cure harmful
testimony that was given by Flournoy. The trial court had ruled inadmissible any evidence related to a letter
the Barkleys wrote to Wendy Butters of Commercial Title Company instructing her to hold the documents
until she received payment. The court based this ruling on the fact that the letter was signed only by the
Barkleys and there was no evidence that Veytia or Johnson knew anything about it. Later in the trial, the
court allowed the Barkleys to testify about their oral instructions to Butters to hold the documents. During
his testimony, Flournoy slipped and mentioned the existence of the letter:


Q [concerning the addenda]: There's not any word in here that tells Mr. Veytia, "You
don't get this document when you sign it."


A: That was covered in the cover letter to the title company.



JBV's counsel objected to the testimony and, after the trial court denied his motion for a mistrial, requested
a curing instruction. The trial court instructed the jury that there was no evidence of any such letter
mentioned by the witness. 

 Flournoy's testimony was cumulative of later unobjected-to testimony concerning the
instructions to Butters. See Tex. R. Civ. Evid. 403. The fact that the instructions were contained in a letter
was immaterial. Under these circumstances, the trial court's instruction to the jury adequately cured any
slight error that may have existed in the admission of the testimony. We overrule point of error four.

 In points of error two, five, six, and seven, JBV challenges the legal and factual sufficiency
of the evidence supporting the verdict on the submitted issues. (7) The judgment does not indicate on which
theory it is based; we may affirm the judgment if it is supportable under any theory. Transport Ins. Co.
v. Faircloth, 898 S.W.2d 269, 274 (Tex. 1995). We note that JBV contends the trial court "overturned
the jury verdict on delivery." Although the trial judge's comments at the hearing on the motion for new trial
did indicate some uncertainty regarding the delivery issue, he expressly reserved his decision on the issue. 
There is no indication of a final ruling overturning the verdict on the affirmative defensive issue of failure to
deliver and we decline to read the record as such.

 When reviewing a no-evidence point, an appellate court reviews only the evidence tending
to support the verdict and disregards all evidence and inferences to the contrary. Mancorp, Inc. v.
Culpepper, 802 S.W.2d 226, 227 (Tex. 1990); Williams v. Bennett, 610 S.W.2d 144, 145 (Tex. 1980). 
The court will sustain a no-evidence challenge only when the record discloses: (1) complete absence of
evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere
scintilla, and (4) the evidence establishes conclusively the opposite of a vital fact. Fowler Homes v. Welch
Assoc., 793 S.W.2d 660, 666 n.9 (Tex. 1990).

 In reviewing the factual sufficiency of the evidence supporting a jury verdict, the court of
appeals considers all the evidence in the record, including any evidence contrary to the judgment. Plas-Tex., Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). The court should set aside the verdict
only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 A written contract does not become binding until it is delivered, and if delivery is conditional
the contract does not become binding until the condition on which delivery depends has occurred. First
Nat'l Bank v. Walker, 544 S.W.2d 778, 784 (Tex. Civ. App.--Dallas 1976, no writ); McAdams v.
Panhandle Mut. Hail Ass'n, 64 S.W.2d 1005, 1005 (Tex. Civ. App.--Amarillo 1931, writ ref'd). There
was testimony that Veytia suggested the parties use Commercial Title Company as a place to hold the
documents until he could deliver the money to the Barkleys. Both the Barkleys and Wendy Butters testified
that the Barkleys gave the originals to Butters to hold until she received JBV's payment of $440,000. This
was some evidence to support the Barkleys' defense that the documents signed on November 30 were not
to become effective until delivered to Veytia. We conclude the evidence was legally sufficient to support
the jury verdict on the documents' conditional effectiveness.

 The only evidence to the contrary is Veytia's controverting testimony that he had no
knowledge that the documents were conditionally effective or of the Barkleys' instructions to Butters to
hold the documents in escrow pending payment of the $440,000. The jury is the sole trier of fact and judge
of the witnesses' credibility and weight to be given their testimony. Times Herald Printing Co. v. A.H.
Belo Corp., 820 S.W.2d 206, 213 (Tex. App.--Houston [14th Dist.] 1991, no writ); Harvey v. Stanley,
803 S.W.2d 721, 724 (Tex. App.--Fort Worth 1990, writ denied). In that respect, the jury may choose
to accept one party's version of the facts over that of another. When determining the sufficiency of the
evidence to support the jury's findings, the appellate court accepts, and will not interfere with, the jury's
resolution of conflicts or inconsistencies in the evidence. Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex.
1988). We conclude that the verdict is not so contrary to the overwhelming weight of the evidence as to
be clearly wrong and unjust.

 The Barkleys were entitled to judgment based on the jury finding that the documents did
not become effective until they were delivered to Veytia upon his payment of $440,000. Nevertheless, we
will address the sufficiency of the evidence supporting the fraudulent inducement defense. A party
attempting to prove fraudulent inducement must show that: (1) a material representation was made; (2) it
was false; (3) the speaker knew it was false when made or that the speaker made it recklessly without any
knowledge of the truth and as a positive assertion; (4) the speaker intended that it be acted on by the other
party; (5) the party acted in reliance upon it; and (6) the party suffered damage. Stone v. Lawyers Title
Ins. Corp., 554 S.W.2d 183, 185 (Tex. 1977).

 The evidence we have detailed describes a scheme by which JBV led the Barkleys to
believe it would pay for an extension of the contract. The fact that Veytia changed the payment date to
December 2 because of "when we expect to get your documents" and suggested using an escrow agent
"to effect the extension" is evidence that the payment was for the three addenda as a whole and not
merely for an option to terminate. In addition, the evidence shows that JBV actually had no means of
paying $440,000 unless it could show its investors the contract had already been extended. It needed the
Barkleys to execute the contract before it could comply with its part of the bargain. The Barkleys relied
on Veytia's representations in signing the documents and suffered damages in losing the benefit of a good
faith bargain and in having its land tied up in litigation for the next two years. We conclude the record
contains evidence on each element of the fraudulent inducement defense and that the evidence is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule points
of error two, five, six, and seven.

 Because we have overruled all of JBV's points alleging error in the trial, we need not
address point of error eight alleging that the trial court's errors were harmful. In addition, because we have
found against appellants on each of their points of error, and none of the appellees' cross points of error
would entitle them to any additional relief, we need not address the cross points. (8)

Summary Judgment

 In point of error nine, JBV contends the trial court erred in granting the Barkleys the earnest
money under the contract. The standards for reviewing a motion for summary judgment are well
established: (1) the movant has the burden of showing that there is no genuine issue of material fact and
that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact
issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3)
every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. 
Nixon v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985).

 The original earnest money contract stated:


DEFAULT: If Buyer fails to comply with this contract, Buyer shall be in default. Seller
may either (a) enforce specific performance, seek such other relief as may be provided by
law, or both, or (b) terminate this contract and receive the Earnest Money as liquidated
damages, thereby releasing the parties from this contract. 



In addition, the August 31 Addenda stated:



The Earnest Money shall become nonrefundable upon Buyers written request for Seller to
execute the affidavit attached as Exhibit "A" herein authorizing Buyers to proceed with the
rezoning process.



JBV failed to comply with the earnest money contract by not closing on November 30. The jury found that
the addenda extending the closing date were void. Accordingly, the Barkleys were entitled to the earnest
money under the terms of the original contract.

 JBV argues that the August 31 Addenda made the earnest money nonrefundable only on
the condition that it requested the Zoning Affidavit. Even were we to accept this argument, the summary
judgment evidence shows that JBV requested the affidavit on November 30. The summary judgment
evidence shows that there was no genuine issue of fact and the Barkleys were entitled to the earnest money
as a matter of law. We overrule the ninth point of error.


CONCLUSION

 Having overruled all of the appellants' points of error, we affirm both the trial court's
judgment on the jury verdict and the summary judgment.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Appeal Cause No. 03-96-279-CV represents the appeal from the take-nothing judgment rendered
in Trial Court Cause 95-02127. Appeal Cause No. 03-96-350-CV represents the appeal from the
summary judgment granted in Trial Court Cause No. 95-07058.
2.   Addendum No. 1 also changed the sellers' name to the Barkley Family Farm Partnership, required
JBV to pay all expenses associated with rezoning, and stated that JBV would not extend the closing date
of November 30, 1994 for any reason, including delays due to rezoning. The addendum provided that JBV
could obtain the zoning affidavit upon written request agreeing to allow the earnest money to become
nonrefundable. However, the earnest money was already nonrefundable under the original contract.
3. The parties also executed a third document on November 30, entitled "Additional Options
Addendum," which allowed JBV to extend the May 31 deadline for up to two consecutive thirty-day
periods for $35,000 each. 
4. By letter from their attorney, the Barkleys gave JBV one more chance to close the deal by December
22. 
5. JBV argued its promise to rezone the property and the higher rate of interest under the note terms
instead constituted its consideration for the extension of the date. 
6. JBV contended that its nonpayment of the $440,000 indicated its decision not to exercise the option
to terminate the contract without a penalty but did not affect the extended closing date.
7. In point of error two, JBV contends the Barkleys did not establish each element of fraud. See De
Santis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990), cert. denied, 498 U.S. 1048 (1991). 
In point five, they contend the trial court abused its discretion in submitting the questions to the jury because
they "were improper and not supported by the evidence." Point six contends the trial court erred in
overruling JBV's motion for judgment notwithstanding the verdict because there was no evidence to
support the jury verdict on each question. Each of these contentions amounts to a "no-evidence" challenge. 
See generally William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence and Insufficient
Evidence," 69 Tex. L. Rev. 515, 520 (1991). Point seven contends the trial court erred in overruling the
motion for new trial "even though it overturned the jury's verdict on the issue of delivery." JBV couches
this point of error in terms of a factual sufficiency challenge.
8. The Barkleys contend in three cross points of error that the trial court erred: (1) in refusing to admit
into evidence the letter instructing Butters to hold the documents until Veytia paid the $440,000; (2) in
refusing to submit the Barkleys' requested jury charge on delivery; and (3) if it set aside the jury's verdict
on delivery.


Earnest Money as liquidated
damages, thereby releasing the parties from this contract. 



In addition, the August 31 Addenda stated:



The Earnest Money shall become nonrefundable upon Buyers written request for Seller to
execute the affidavit attached as Exhibit "A" herein authorizing Buyers to proceed with the
rezoning process.



JBV failed to comply with the earnest money contract by not closing on November 30. The jury found that
the addenda extending the closing date were void. Accordingly, the Barkleys were entitled to the earnest
money under the terms of the original contract.

 JBV argues that the August 31 Addenda made the earnest money nonrefundable only on
the condition that it requested the Zoning Affidavit. Even were we to accept this argument, the summary
judgment evidence shows that JBV requested the affidavit on November 30. The summary judgment
evidence shows that there was no genuine issue of fact and the Barkleys were entitled to the earnest money
as a matter of law. We overrule the ninth point of error.


CONCLUSION

 Having overruled all of the appellants' points of error, we affirm both the trial court's
judgment on the jury verdict and the summary judgment.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Appeal Cause No. 03-96-279-CV represents the appeal from the take-nothing judgment rendered
in Trial Court Cause 95-02127. Appeal Cause No. 03-96-350-CV represents the appeal from the
summary judgment granted in Trial Court Cause No. 95-07058.
2.   Addendum No. 1 also changed the sellers' name to the Barkley Family Farm Partnership, required
JBV to pay all expenses associated with rezoning, and stated that JBV would not extend the closing date
of November 30, 1994 for any reason, including delays due to rezoning. The addendum provided that JBV
could obtain the zoning affidavit upon written request agreeing to allow the earnest money to become
nonrefundable