JOHN D. YOUNG, Appellant, v. JENNIE HAMILTON et al., Appellees.

No. 40680.

FEBRUARY 9, 1932.

C. J. Cash and George C. Gorman, for appellant.

Doxsee & Doxsee, for appellees.

MORLING, J.—James A. Hamilton died March 15, 1915,

seized of a farm consisting of approximately 160 acres, which was occupied by himself and family as a home. He left surviving him his widow, the defendant Jennie, and seven children, three of whom were minors. Under date of April 3, 1915, the widow as first party and the four adult children, including Blanche Mann, as second parties, made and acknowledged a written agreement reciting that the widow was in possession of the farm and maintaining a home thereon for the minors and stipulating:

"In order that said home may not be broken up and there may be a sufficient amount of income to support the said Jennie Hamilton and said minor children, we the parties of the second part hereby agree that the said party of the first part may occupy and use said home and land appurtenant thereto (the land in controversy) * * * during the period of her widowhood, or so long as she desires to use or lease said land, and that said parties of the second part grant unto her the right to use said property free of rent in consideration of her also maintaining said minor children during the years when they need her support, and also keeping up all taxes, assessments and improvements on said property at her own expense, but by granting her the right to use said premises during her widowhood as aforesaid, we do not waive any of our title to said land as heirs of the said James A. Hamilton, nor does the said Jennie Hamilton, party of the first part, waive her right to her distributive share in the estate of the said James A. Hamilton, and she retains the privilege of having her one-third interest set off to her if she sees fit, but whenever she does so then this agreement shall cease."

The then minors after attaining their majority also executed the agreement, acknowledging it on September 11, 1928. The agreement was not recorded. Under date of March 27, 1928, Blanche Mann executed to plaintiff a mortgage, the description in which is not set out in the record before us further than as will be presently referred to. The mortgage was given to secure the promissory note of Blanche dated March 27, 1928, due April 1, 1928. Plaintiff brought suit against Blanche and her husband, sole defendants, at the June term, 1928, of the District Court to recover judgment for the amount of the note and to

foreclose the mortgage. Decree of foreclosure was entered June 5, 1928. Special execution issued under which evidently there was a sheriff's sale to plaintiff July 16, 1928. At the expiration of the period of redemption sheriff's deed issued to plaintiff for (as stated in the abstract) ''land described in petition.'' On September 13, 1928, petition for partition in the case now before us was filed. This petition alleges that James A. Hamilton died intestate ''seized in fee of the following described real estate (describing the 160 acres) * * * Par. 2. That the said James A. Hamilton left as his surviving widow and heirs at law the defendants, namely: Jennie Hamilton, his widow; and the following named children and only heirs at law: Al Hamilton * * * and Blanche Hamilton Mann (naming the seven) * * * Par. 3. That subsequent to the death of said intestate, James A. Hamilton, the plaintiff became the purchaser from said Blanche Mann and her husband G. V. Mann of the undivided interest of the said Blanche Mann in said real estate, by a conveyance as shown by the abstract of title hereto attached. Par. 4. That the plaintiff and the defendants (naming those other than Blanche) * * * are each entitled to an undivided two twenty-first (2-21) of said real estate and the defendant Jennie Hamilton, as widow, is entitled to an undivided one-third (1-3) thereof * * *.'' Defendants' answer may be summarized as an admission of the death of James A. Hamilton, intestate, seized of the 160 acres, and of the survival of the widow and seven children as alleged, a denial of plaintiff's alleged interest and right to partition, a denial of the correctness of the abstract of title, and an affirmative defense based upon the agreement between the widow and children, which is set out, of which plaintiff is alleged to have had notice, and because of which and of full performance by the widow and her continued possession of the land and right thereto as alleged, defendants claim that no partition can be had. Plaintiff replied, denying knowledge or information as to the alleged agreement. By reply ''the plaintiff further alleges that if said agreement and memorandum was made prior to the mortgage of plaintiff and the sheriff's deed given in pursuance of a foreclosure of plaintiff's mortgage, that the said alleged agreement is junior and inferior to the right and title of plaintiff for the reason that plaintiff is a purchaser in good faith and for full value of the

undivided 2-21 interest of Blanche Mann prior to any recording of said agreement and said answer does not allege that there was any notice of said unrecorded agreement or memorandum either actual or constructive on the part of the plaintiff. Plaintiff denies affirmatively that there was any record or any notice either actual or constructive of said instrument prior to the mortgage and deed, given to him, of any kind or nature.''

The abstract of the record states that plaintiff filed an amendment to petition, ''setting forth a continuation of the abstract of title'' showing sheriff's deed to ''the undivided two twenty-first of same * * *.'' No abstract of title appears in the record before us. No allegation respecting the mortgage and the sheriff's deed appears otherwise in the pleadings than above set forth. The abstract of the record shows that plaintiff offered in evidence the sheriff's deed and the record of the mortgage ''covering the real estate therein described,'' but no further showing of contents with respect to description. Plaintiff as a witness in his own behalf testified that he ''had a transaction with Mr. and Mrs. Mann about March 27, 1928. Q. And state whether at that time any real estate mortgage was executed? (Objection) * * * A. Yes. It was executed for money that I paid them on a couple of notes. Q. To whom did you pay this money? (Objection) * * * A. I turned it over to the bank. Q. How much money? (Objection) * * * A. $1400. At the time that I paid this $1400 I took up some notes.'' He identified two notes as those that he ''took up.'' He was asked how much was due on the notes, and over objection testified, $400 on one and $1000 on the other. He said that he paid both notes to the Onslow Savings Bank, and at that time got from Mr. and Mrs. Mann the note of March 27, 1928.

Defendants proved the execution at the dates stated in the acknowledgment (April 3 and 16, 1915), of the agreement set out in the answer; proved that defendant Jennie remained in possession without interruption to the time she gave her testimony; proved her continued widowhood and payment of taxes. Jennie testified that after her husband's death ''things went along on the farm about as they did before. It was occupied by us as a home the same as before;'' that the son Al, as near as he could, discharged the duties that her husband had attended to prior to his death. Blanche testified that she was married at

the time of her father's death and for the past 11 years had lived a half mile from her mother; that she signed the agreement; that she was "the Blanche Mann who became indebted to Mr. Young. He secured a judgment against me in district court. It was my interest in the property against which he sought to obtain a judgment and encumber. He got a sheriff's deed of my share;" that she had not been in possession of the property at any time since her father's death; that in a conversation with plaintiff about three weeks after she signed the mortgage and note something was said "as to mother's interest in the property, as to her right to use it during her widowhood. * * * He said the paper had not been recorded, it was not on the record here, and he didn't think it was any good. * * * He said Mr. Paulsen informed him it was not of record. * * * I told Mr. Young we had signed our right over to mother and I didn't think there could be anything done with it. He then said it was not on the records and didn't see why his mortgage was not good. I understood he meant that he had Mr. Paulsen look up to see if this agreement was on record. * * * Think he said the agreement with mother was not worth the paper it was written on. At the time I signed and delivered this mortgage to Mr. Young there wasn't anything said by me about there being any writing between me and my mother which affected my interest in this land, nothing said by me, Mr. Young or anyone else, that I know of. Didn't hear it discussed there at all. This $2700 note to the Onslow Bank on which $400 was unpaid was secured by mortgage on the same interest in the farm."

Plaintiff recalled testified that three or four days after he had taken the note and mortgage Al said: " 'Uncle John, do you know that you can't do nothing with that mortgage and note?' 'Why can't I do anything with it?' He said: 'We have made an assignment to mother, us four older children; you can't collect that mortgage and note until mother dies, she will have the benefit of that property until her death.' I said: 'Well, did you put that on record?'' He said, 'Yes.' I said no more, was kind of beat. Mr. Paulsen and I had been up and looked over the records before I took the $1400 note and mortgage. That was when I was talking with the bank about taking up those notes. I asked Mr. Paulsen if it was clear when he took the mortgage and he said it was, but we went up to look at the

records to see if anything had been put on since the bank took the mortgage. He looked and said there was nothing there. Then I went home and paid off those notes and they gave me a note and mortgage. Up to that time I had never heard of any claim or statement from anybody that some kind of a writing had been made between the mother and certain children,—had never heard of any such thing. * * * The first talk I had with anyone after getting the note and mortgage was when I called Al Hamilton out of the pool room. The next day after this talk I came to Anamosa and asked Mr. Cash to go to the records and look thoroughly and see if the agreement mentioned by Al Hamilton was there and report to me. I returned home. Mr. and Mrs. Mann came in a few minutes. She said I could do nothing with the mortgage and note because the four older children had made an assignment to their mother, and in answer to my question said it was on record. I knew James A. Hamilton, understood he died without a will. I knew all the different members of his family, his widow and children. I lived on a farm near by at his death, about two miles distant. I had married his sister, now dead. Have been on the Hamilton farm several times since his death. I knew which of the children lived at home after his death. I had observed who was farming the Hamilton place after his death. Al Hamilton appeared to be the one who did the business from the death of his father to the present winter. * * * I observed that Al was the one doing the business. * * * Never asked Mrs. Mann how much she owned in the farm, but she told me she owned a share in it. When I went to Anamosa to look this up I did not go to the clerk's office to see how the estate was settled. I was on the street and Mr. Paulsen looked it up. He said he went to the recorder's office. I knew how many heirs there were, did not have to look at the records, did not look up that. I heard of the claim that the children had signed over something to the mother. They told me so. * * * The talk with Al was two or three days after the mortgage was made, when he told me about the assignment to his mother. Then I told him I did not think so, because Mr. Paulsen had been to the records and said there was nothing. * * * Saw Al shipping hogs, did not expect the widow to do that, thought Al did that for her.'' ''I never thought Al owned the farm. Q. You didn't,—who did you think owned the farm?

A. I thought the James Hamilton estate. Q. And the widow was a part of the estate, wasn't she? A. She what? Q. She was a part of the estate,—the widow? A. She was, sure. * * * Q. Did you ever ask Mrs. Mann how much interest she owned in the farm? A. No, I didn't ask her right out and out, but she told me she owned a share in it. Q. Now when you went to Anamosa, you say to look this up, did you ever go to the clerk's office here in this building to determine how the estate was settled and who owned the different parts of the estate? A. No. * * * Q. Yes, you said you came down here to look up the records,—where did you go? A. I got out in the street out here and Mr. Paulsen went and looked over the records for me. Q. In the recorder's office? A. I suppose that is where he went; he said he went to the recorder's office. Q. And then before you bought the mortgage you never looked up any records? A. I sure did. Q. To see who owned the property and what share each owned in it? A. Well, I knew—no. * * * Well, I supposed I knew how many heirs there was. Q. That is not the question, the question is whether you looked up the record to see that. A. I did not have to look up the record to find out how many heirs there was. Q. Let me ask the question again. Did you look up the record to see? A. No, I didn't. Q. You had heard, however, hadn't you, that there was some claim that the children had signed over something to the mother? (Objection) * * * A. Well, they told me so. Q. Yes, and you didn't go to the mother to find out whether that was true or not, did you? A. No. Q. Did you ever talk to the mother about it at all? A. No. Q. When you heard that, why didn't you go and see the mother in regard to that? A. I was not dealing with the mother. Q. And you didn't care what she had or what she didn't have,—is that the idea? (Objection) * * * A. Did I care? Q. Yes. A. What she had? Q. Yes, or what she didn't have? A. Or what she didn't have? Q. Yes. A. Well, it didn't make much difference to me what she had or what she didn't have. * * * Q. Did you ever see Al Hamilton either buying or selling any property? A. Well, I don't know what you would call it,—I have seen him shipping the hogs. Q. There was nothing unusual in his doing it and you didn't think because he did it that there was anything un-

usual in it, did you? A. I thought he was doing it for his mother.''

I. Plaintiff's principal contention is that he is not affected by the agreement between the widow and children because it was not recorded.

As has been seen, the petition alleges that plaintiff became the purchaser ''of the undivided interest of the said Blanche in said real estate.'' The mortgage, according to the appellant's abstract, is of ''the following described tract of real estate lying and being situated in the county of Jones and State of Iowa, to wit (same land as described in petition.)'' Plaintiff's testimony is that he ''never asked Mrs. Mann how much she owned in the farm, but she told me she owned a share in it.'' ''I didn't ask her right out and out, but she told me she owned a share in it.'' On the record before us it cannot be held that the mortgage to plaintiff was of two twenty-firsts of the 160 acres. It was only of ''the undivided interest of the said Blanche Mann in said'' 160 acres. On the undisputed evidence, Blanche Mann's interest at the time the mortgage was executed was in the possession of her mother, under an agreement by which the mother had the right to use it free of rent during widowhood, or so long as she desired to use it. The mortgage to plaintiff was only of the interest which Blanche then had. McNear v. Mc-Comber, 18 Iowa 12; Lee v. Lee, 207 Iowa 882, 888; Henderson v. Beatty, 124 Iowa 163.

As the mortgage was only of Blanche's interest, it was no more than a quitclaim (as security). Under it the plaintiff was not a bona-fide purchaser without notice, within the protection of the recording law. Watson v. Phelps, 40 Iowa 482; Besore v. Dosh, 43 Iowa 211; Light v. West, 42 Iowa 138; Springer v. Bartle, 46 Iowa 688; Fogg v. Holcomb, 64 Iowa 621; Hannan v. Seidentopf, 113 Iowa 658.

II. The language of the recording acts with respect to instruments affecting real estate and chattel mortgages is, so far as we are here concerned, the same. Section 10105, Code, 1924, reads:

''No instrument affecting real estate is of any validity against subsequent purchasers for a valuable consideration, without notice, unless filed * * *.''

Section 10015 reads:

"No sale or mortgage of personal property, where the vendor or mortgagor retains actual possession thereof, is valid against existing creditors or subsequent purchasers, without notice, unless a written instrument conveying the same is executed, acknowledged like conveyances of real estate, and such instrument, or a duplicate thereof, is duly recorded, or filed * * *."

We have frequently had occasion to discuss the question of the burden of proof in cases of unrecorded instruments under these statutes. Our decisions are not altogether harmonious.' The instrument affecting real estate in the one case or the chattel mortgage in the other is perfectly valid between the parties, whether recorded or not. The purpose of the recording law is to protect the public or persons dealing with the property in good faith without knowledge of secret interests. It is only those who for a valuable consideration and without notice deal with the apparent owner of the property or of an interest in it that are within the protection of the recording laws. The instrument though unrecorded is valid generally. It is of no effect only in the exceptional case of "subsequent purchasers for valuable consideration without notice."

Our decisions under the chattel mortgage statute were fully reviewed in Loranz & Co. v. Smith, 204 Iowa 35, where we held that the burden was upon the existing creditor or subsequent purchaser (in that case a creditor) to allege and prove that he was an existing creditor (or subsequent purchaser without notice.)

In Manbeck Motor Sales Co. v. Garside, 208 Iowa 656, this case was followed, and it was held that to avoid the lien of a chattel mortgage, which because of defective acknowledgment was not legally recorded, it was incumbent upon the subsequent purchaser to allege and prove that he was a purchaser for value and did not have actual notice of the terms of the instrument.

In Blackman v. Henderson, 116 Iowa 578, it was held that a mortgage which was not entitled to record because of defective acknowledgment was good as against a subsequent purchaser unless he pleaded that he or his grantor was a purchaser for value without notice.

1172

"As the case stands, we have a mortgage valid as between the mortgagors and the mortgagee, without proper proof that the subsequent purchase was without notice, and for a valuable consideration. Such being the case, the plaintiff is entitled to the foreclosure of his mortgage, with a judgment *in rem* for the amount due on the bond."

This case was followed in Johnson v. C. B. & Q. R. Co., 202 Iowa 1282, 1288. This doctrine is likewise laid down in Nolan v. Grant, 53 Iowa 392; Gardner v. Early, 72 Iowa 518, 520; Hannan v. Seidentopf, 113 Iowa 658, 662; Meredith v. Beadle, 211 Iowa 390; Chariton & Lucas County Nat. Bank v. Taylor, 210 Iowa 1153; Kibby v. Harsh, 61 Iowa 196, 199; Anders v. Crowl, 210 Iowa 469, 477; Conway v. Rock, 139 Iowa 162, 164; Ohio Sav. Bank & Tr. Co. v. Schneider, 202 Iowa 938; Zacharia v. Cohen Co., 140 Iowa 682; Manbeck Motor Sales Co. v. Garside, 208 Iowa 656; Hume v. Franzen, 73 Iowa 25.

The proof must be of actual payment before notice. Sillyman v. King, 36 Iowa 207; Kitteridge v. Chapman, 36 Iowa 348; Nolan v. Grant, 53 Iowa 392.

The effort to confer an interest in hostility to a prior unrecorded instrument would be ordinarily indicative of bad faith, a fraud. A contest between the claimants to the two conflicting interests therefore involves the question of *bona fides*, as recognized in Nolan v. Grant, 53 Iowa 392; Gardner v. Early, 72 Iowa 518, 520; Hannan v. Seidentopf, 113 Iowa 658, 662; Meredith v. Beadle, 211 Iowa 390; Chariton & Lucas County Nat. Bank v. Taylor, 210 Iowa 1153; Kibby v. Harsh, 61 Iowa 196, 199; Merrill v. Tobin, 82 Iowa 529, 535.

This rule as to the burden of proof in this class of cases is in harmony with that adopted in analogous cases of fraud. Reining v. Nevison, 203 Iowa 995, 998; Coburn v. Davis, 206 Iowa 649, 652; Starr Bros. v. Stevenson, 91 Iowa 684, 692; Light v. West, 42 Iowa 138, 141.

The authorities have not always been attentive to the distinction between the burden of proof and the burden of going on with evidence. When it appears that the subsequent purchaser has paid an adequate consideration and purchased in the ordinary course of business, under circumstances not indicating bad faith, he makes out a prima-facie case calling upon the

holder of the unrecorded instrument to go on with his evidence.

In Walter v. Brown, 115 Iowa 360, 362, it is held, approving McCormick v. Leonard, 38 Iowa 272, and Hoskins v. Carter, 66 Iowa 638:

"* * * 'in a contest between the holder of a prior mortgage, but which is recorded after a subsequently executed mortgage, the burden of proof to show that the latter had notice of the prior mortgage is on the holder of the last named mortgage.'" Quoting from Jones on Real Property: " 'While, as a general rule, the burden of proving one is an innocent purchaser, without notice of prior equities, is upon the purchaser, yet, when the subsequent purchaser has proved his purchase, and payment for the land, the onus is shifted to the person asserting the equity or incumbrance to show notice thereof to the purchaser; that is, either actual notice, or knowledge of such facts as would put an ordinarily prudent man upon inquiry, which, if followed up, would have led to the discovery of the equity or incumbrance.' "

This case and Block & Pollak Iron Co. v. Holcomb-Brown Iron Co., 105 Iowa 624, 627, therefore, are founded on the rule that when the party having the burden of proof makes out a prima facie case the burden of going on with the evidence is shifted to his opponent. In Conway v. Rock, 139 Iowa 162, 164, Walter v. Brown, 115 Iowa 360, is cited in connection with the rule there re-iterated that "the grantees in the last deed cannot be protected as innocent purchasers unless they pleaded or proved that they paid a valuable consideration."

So far as they seem to hold that the burden of proof is upon the holder of the unrecorded instrument, the following cases are overruled: McCormick v. Leonard, 38 Iowa 272; Raymond v. Morrison, 59 Iowa 371; Hoskins v. Carter, 66 Iowa 638; Hutchinson v. Olberding, 136 Iowa 346.

Plaintiff had the burden of pleading and proof that he was a subsequent purchaser for valuable consideration without notice.

Plaintiff must be charged with actual notice of such facts as he would have ascertained if he had made such inquiries as ordinary prudence would have required him to make. Norwood v. Parker, 208 Iowa 62, 67. Plaintiff was the brother-in-

law of the deceased, and lived within a short distance of the land in controversy. He was well acquainted with the defendants and "visited in the Mann family pretty often." He knew which of the children were at home. He had some knowledge at least as to how the widow and the son Al were conducting their business. He "thought (Al) was shipping the hogs for" the widow. He thought it necessary to have the records in the recorder's office examined, but he did not make any investigation in the office of the clerk. The testimony of Blanche is, "I understood he meant that he had Mr. Paulsen look up to see if this agreement was on record." It seems quite probable that this is what plaintiff had in mind in having Paulsen look up the records in the recorder's office before he took the mortgage. On his own admission he supposed that Al was conducting the business of the farm for his mother. No explanation is given of his apparent haste in taking on March 27, 1928, a note due four days later and a mortgage which in four days could be foreclosed. He obtained decree of foreclosure June 5, 1928, sold the land June 16, 1928, obtained sheriff's deed in due course, and then commenced this suit.

In his abstract appears the unqualified testimony of plaintiff: "I heard of the claim that the children had signed over something to the mother. They told me so." Plaintiff's attitude before he took the mortgage was one at least of suspicion of the existence of rights in the widow not shown by the record. His denial of information is very restrictive: He "had never heard of any claim or statement from anybody that some kind of a writing had been made between the mother and certain children. Had never heard of any such thing." His testimony is quite consistent with his having possessed information that the widow's claims were other than to a mere third. We think that he had reason to suspect, and did suspect, that the mother was entitled to the possession of the shares of the children. We think that he assumed that if he took a mortgage it would be superior unless the widow's right appeared upon the record. As a witness he was evasive. The circumstances of which he had knowledge were sufficient at least to put him upon inquiry. We are of the opinion that the plaintiff is not a purchaser in good faith.

III. Blanche on sufficient consideration had agreed with

her mother that her mother should have the use of the land during her widowhood, or as long as she desired. The agreement was performed upon the part of the mother. Blanche had no right to possession and no right to a division of the property so long as her mother in conformity with the agreement was entitled to possession. Henderson v. Henderson, 136 Iowa 564; 47 C. J. 298.

Plaintiff's mortgage and subsequent sheriff's deed were subject to this agreement. The mother still has the right to possession. Plaintiff is not entitled to partition.—Affirmed.

WAGNER, C. J., and EVANS, STEVENS, DE GRAFF, ALBERT, KINDIG, and GRIMM, JJ., concur.