# IN THE SUPREME COURT OF IOWA

No. 15–0995

Filed March 3, 2017

**CENTRAL BANK and REAL ESTATE OWNED, L.L.C.,** an Iowa Limited Liability Company,

Appellant,

vs.

**TIMOTHY C. HOGAN,** as Trustee of the Liberty Bank Liquidating Trust; **LIBERTY BANK, F.S.B.; IOWA STATE BANK; FIRST STATE BANK; FARMERS SAVINGS BANK; FARMERS TRUST & SAVINGS BANK;** and **FIRST COMMUNITY BANK,**

Appellees.

---

Appeal from the Iowa District Court for Dickinson County, Carl Petersen, Judge.

Bank appeals grant of summary judgment to appellees in an action seeking a declaratory judgment that the bank had no obligations under participation agreements entered into by the bank's predecessor in interest. **AFFIRMED.**

Nicholas J. Brown of Nick Brown, P.C., Storm Lake, for appellant.

Robin K. Carlson of Stinson Leonard Street L.L.P., Kansas City, Missouri, and Scot Bauermeister of Fitzgibbons Law Firm, L.L.C., Estherville, for appellee Timothy C. Hogan.

Craig A. Knickrehm and Andrew R. Biehl of Walentine, O'Toole, McQuillan & Gordon, L.L.P., Omaha, Nebraska, for appellee participant banks.

**APPEL, Justice.**

In this case, we deal with the question of whether participation agreements in connection with a loan transaction transferred security interests in the underlying property or only a contractual right to the proceeds from the originating bank. For the reasons expressed below, we conclude that the participating agreements transferred security interests in the underlying property to the participating banks and that those security interests were perfected under article 9 of the Uniform Commercial Code (U.C.C.).

## I. Factual and Procedural Background.

Between 2008 and 2009, Liberty Bank made five loans to Iowa Great Lakes Holding, L.L.C., the owner of real property known as "The Inn at Okoboji" (The Inn). The Liberty Bank loan (the loan) was secured by real and personal property associated with The Inn. Liberty Bank and five other banks entered into participation agreements related to the loan. Under the participation agreements, Liberty Bank maintained an undivided 59.48% interest in the transaction, while the participating banks held an undivided 40.52% interest.

Iowa Great Lakes Holding defaulted on the loan and the collateral was voluntarily surrendered to Liberty Bank through a "Voluntary Surrender Agreement" and an "Agreement for Alternative Nonjudicial Foreclosure" pursuant to Iowa Code section 654.18 (2014), thereby extinguishing the mortgage. After the surrender and foreclosure, Liberty Bank and the participating banks entered into an agreement with a hotel management company to operate The Inn. The proceeds of operations were held in a segregated account with Liberty Bank with the participating banks maintaining their pro rata interest in the proceeds.

On October 1, 2013, Liberty Bank and Central Bank entered into a "Purchase and Assumption Agreement" (P&A Agreement). Under the P&A Agreement, Central Bank acquired assets from Liberty Bank, including "loans." Under the P&A Agreement, the term "loans" was broadly defined to include loans in which the borrower's obligations had been extinguished. The Great Lakes loans remained on the books of Liberty Bank as nonledger loans.

At the time of closing of the P&A Agreement, Liberty Bank conveyed The Inn to a Central Bank affiliated entity via quitclaim deed. The language of the quitclaim deed indicated that it transferred only the interests of Liberty Bank.

In 2014, Central Bank filed a declaratory action against the trustee of Liberty Bank and the five participating banks. Central Bank sought a ruling that it owned The Inn property free and clear of any interest of the participating banks.

The trustee for Liberty Bank and the participating banks filed a joint motion for summary judgment. They maintained that under the participation agreements, Liberty Bank transferred to them an undivided interest in the entire transaction, including the security interest of Liberty Bank.

The district court agreed. According to the district court, the participation agreements did not merely transfer the right to a share of loan proceeds. Instead, according to the district court, the participation agreements transferred "all legal and equitable title in its share of the loan and collateral" to the participating banks. As a result, the district court granted summary judgment to the trustee for Liberty Bank and the participating banks, stating that it could not declare that Central Bank

owned the property in fee simple because Liberty Bank did not sell Central Bank a one hundred percent interest in the property.

Central Bank appeals.

## II.  Standard of Review.

Generally our standard of review for declaratory actions is determined by the nature of the action below. *Lindsay v. Cottingham & Butler Ins. Servs., Inc.*, 763 N.W.2d 568, 572 (Iowa 2009). When a summary judgment is granted on a declaratory action, however, we review for correction of errors at law because we are reviewing the summary judgment ruling, not the declaratory judgment. *Shelby Cty. Cookers, L.L.C. v . Util. Consultants Int'l, Inc.*, 857 N.W.2d 186, 189 (Iowa 2014).

## III.  Discussion.

**A.  Introduction.**  Participation agreements have been around at least since financiers successfully sought additional parties to participate in a massive loan to the imperial Russian government in 1916—an undertaking which, as events subsequently showed, was a poor investment. Jeffrey D. Hutchins, *What Exactly Is a Loan Participation*, 9 Rutgers-Camden L.J. 447, 450 (1978) [hereinafter Hutchins]. Although not limited to financial institutions, participation agreements have played an important role in the banking sector of the American economy. *See* Alan W. Armstrong, *The Developing Law of Participation Agreements*, 23 Bus. Law. 689, 689 (1968) [hereinafter Armstrong] (describing the rapid development of participation agreements and their economic benefits); Hutchins, 9 Rutgers-Camden L.J. at 447 (noting that loan participations are "widely used throughout the financial community in recent years").

The usual participation agreement involves a lead lender and participating parties. Hutchins, 9 Rutgers-Camden L.J. at 448. The

transaction is documented by a participation agreement and a summary page called a certificate of participation. Patrick J. Ledwidge, *Loan Participation Among Commercial Banks*, 51 Tenn. L. Rev. 519, 521 (1984) [hereinafter Ledwidge].

The participation agreement, of course, may contain a wide variety of provisions agreed upon by the parties. Hutchins, 9 Rutgers-Camden L.J. at 449. Under most participation agreements, however, the lead lender is ordinarily responsible for originating the loan, but seeks to share the financial obligations and benefits with other parties. *Id.* at 448. The lead lender ordinarily assumes responsibility for the servicing of the loan. *Id.*

The reasons for loan participations are varied. *Id.* at 449. A bank may seek third-party participation in a loan transaction to avoid borrowing limits or to promote diversity in its loan portfolio. Ledwidge, 51 Tenn. L. Rev. at 521–22. Alternatively, a customer may prefer involving multiple banks with whom it has relationships in a loan transaction. *Id.* at 522.

This case involves an issue that has surfaced only relatively recently—namely, what happens to the interests of participants when the lead bank fails? In the distant past, financial institutions rarely failed and thus the question was largely academic. *See generally* James W. Brewer & Elaine Childress Lee, *Bank Failure and the FDIC: A Survey of Legal Rights and Relationships of the Client and the Insolvent Bank*, 18 Tex. Tech L. Rev. 1193, 1193–94 (1987). Beginning with the failure of financial institutions in the 1970s and 1980s, however, the question of the status of participants in a loan transaction after the failure of the lead bank has become a topic explored in a number of cases and in the academic literature. *See* Kevin B. Fisher, *Loan Participations and Bank*

*Failures: The* Penn Square *Decisions*, 44 Sw. L.J. 753, 754–58 (1990) [hereinafter Fisher].

In this case, the loan originated with Liberty Bank. The borrower entered default and the collateral securing the loan, including real property known as The Inn, was voluntarily surrendered to Liberty Bank. After surrender of the property, Liberty Bank voluntarily dissolved and was taken over by a trustee. The trustee then sold the surrendered collateral associated with The Inn to Central Bank through a quitclaim deed.

The question in this case was whether Central Bank owns the entire property in fee simple as a result of its transaction with the trustee. We begin our analysis by reviewing the terms of the various agreements and documents in this case.

**B. The Documentary Record.**

1. *The participation agreements.* Liberty Bank entered into five sets of documents related to its loan and the participation of additional banks. Except for dates and names of the parties, the participation documents are identical.

The preface to the participation agreement states that the originating bank "hereby sells" and the participating bank "hereby purchases" a "participation interest" in the loan. The loan "is more fully described on attached Exhibit A." Exhibit A is a one-page document identifying the loan, providing details of the terms of the loan, and describing the collateral supporting the loan. The collateral listed includes a real estate mortgage on The Inn property and an "[a]ll [i]nclusive" U.C.C. filing.

Paragraph 1 of the participation agreement is entitled "Purchase of Participation" and generally describes what is being bought and sold.

Paragraph 1 provides that the originating bank is selling "a participation interest as set forth on attached Exhibit A" to the participating bank.

Paragraph 3 of the participation agreement is entitled "Possession and Control of Note and Collateral" and addresses issues related to the security underlying the loan. Paragraph 3 provides the originating bank "shall hold the Note and Loan Documents, in trust, for the undivided interest of Participating Bank and other participating banks."

Paragraph 3 addresses the issue of insolvency of the originating bank. In the event that the originating bank becomes insolvent, or "any other event which, pursuant to this Agreement, makes it legally necessary for Participating Bank to obtain possession of, or legal title to, the Note, Loan Documents, Loan file, or business records regarding the Loan" in order to enforce the participating bank's rights pursuant to the agreement, the originating bank "shall surrender possession and legal title shall revert to Participating Bank, regarding such documents and records so held in trust by [the] Originating Bank for Participating Bank."

Paragraph 9 of the participation agreement is entitled "Default" and addresses the question of default of the borrower. In the event of a default of the borrower,

> the interests of the Originating and Participating Banks in such Defaulted Loan and in any of the Security therefore shall be deemed ratably concurrent and any payments received thereafter from such Borrower or any other parties to the Loan Documents executed in connection with such Defaulted Loan or by liquidation of collateral, application of deposits, or otherwise shall be applied in proportion to each Bank's then respective interest in the total amount of the Defaulted Loan outstanding.

Paragraph 9 also addresses the issue of set-off. If the originating bank or any participating bank receives more than a pro rata share of the loan through an offset, the bank receiving the greater proportion

through the offset is required to make payments to the other participants to equalize payments received to the pro rata share that each participant bank is entitled to under the participation agreement.

2. *The purchase and asset agreement.* Under the P&A Agreement, Central Bank purchased from Liberty Bank "the Management Company Cash on Deposit." The term "Management Company Cash on Deposit" is defined to mean "Liberty Bank's portion of the cash held by third party management companies with respect to OREO [other real estate owned], including The Inn at Okoboji."

3. *The quitclaim deed and bill of sale.* Pursuant to the P&A Agreement, Central Bank received a quitclaim deed with respect to The Inn property from Liberty Bank. The quitclaim deed stated that Liberty Bank transferred to Central Bank "all of its right, title, interest, estate, claim, and demand" in various real property thereafter described, including The Inn property. The bill of sale further states that Liberty Bank conveys to Central Bank "all of its right, title and interest in and to the Transferred Assets [including The Inn property]." An email dated September 16, 2013, shows that Central Bank was aware of the existence of the participating banks in connection with the loan in which The Inn served as collateral.

**C. Positions of the Parties.** Central Bank asserts that this case turns on the nature of the parties' agreement. *See Chase Manhattan Bank, N.A. v. FDIC*, 554 F. Supp. 251, 256 (W.D. Okla. 1983) (holding that, under the express terms of the participation agreement, no security interest in the collateral passed to the participating bank); *First Bank of WaKeeney v. Peoples State Bank*, 758 P.2d 236, 238 (Kan. Ct. App. 1988) (holding rights of participant banks stem from the express terms of the participation agreement). Central Bank recognizes that a bank may sell

a participation in a loan that is either secured or unsecured. Central Bank asserts that standard rules of contract interpretation should be applied to the participation agreements in this case to answer this basic question.

Central Bank asserts that using ordinary contract interpretation principles, the participation agreements between Liberty Bank and the five participating banks in this case were loan transactions that created a debtor–creditor relationship. According to Central Bank, the participating banks had no right to the underlying loan documents and collateral, but only a contractual right against Liberty for payment. Liberty Bank, according to Central Bank, did not contract away any rights in the underlying collateral supporting the loan. Central Bank notes that the participation agreements are "silent to granting a security interest in and to the property, collateral, or underlying loan documentation." *See Jefferson Sav. & Loan Ass'n v. Lifetime Sav. & Loan Ass'n*, 396 F.2d 21, 24 (9th Cir. 1968) (holding the sale of property by the lead bank was valid and participating banks had the right to either the proceeds of the sale or a claim against the trustee for violation of the participation agreement); *Ross v. First Sav. Bank of Arlington*, 675 N.W.2d 812, 817 (Iowa 2004) (implying that participating banks did not have any interest in and to the contracts between the lead bank and the consumer); *In re Receivership of Mt. Pleasant Bank & Trust Co.*, 526 N.W.2d 549, 556 (Iowa 1995) (stating "the participant banks were not mere creditors of the receivership estate but were parties to contracts" with the lead bank).

Further, Central Bank maintains that nothing in the participation agreements created a fiduciary duty between Liberty Bank and the participating banks. In support of its argument, Central Bank cites a

number of cases in which courts held that participation agreements did not create fiduciary relationships. *See Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1408 (10th Cir. 1984); *N. Trust Co. v. FDIC*, 619 F. Supp. 1340, 1345 (W.D. Okla. 1985); *First Bank of WaKeeney*, 758 P.2d at 240.

Central Bank suggests that the participating banks might have an interest in the proceeds of the sale paid by Central Bank to Liberty Bank, but have no claim against Central Bank. To the extent the participating banks claim they have not been paid pursuant to their participation agreements, their sole remedy is to look to Liberty Bank.

Further, Central Bank maintains that Liberty Bank transferred to Central Bank fee simple interest in The Inn real estate under the P&A Agreement. Central Bank notes that none of the participating banks had filed a security interest in the property. Central Bank further states that it did not assume any of Liberty Bank's potential liabilities toward the participating banks under the P&A Agreement.

Central Bank further asserts that the participating banks have no perfected security interest in The Inn property to support the loan obligation of Liberty Bank. In order for a security interest to attach, there must be a security agreement. *See* Iowa Code § 554.9102(1)(*bv*). Central Bank concedes that if the agreement between the parties creates a security interest in the contract, then automatic perfection attaches under Iowa Code section 554.9203(1). But, as indicated above, Central Bank claims that the agreement creates no such security interest and, as a result, no security interests attached.

Based on the above line of reasoning, Central Bank asserts that the district court erred by failing to find that the language of the participation agreements in this case created a security interest. Instead, according to Central Bank, the district court simply assumed

that all participation agreements give rise to security interests in the underlying collateral.

Central Bank further notes that no mortgage has ever been recorded on the property in favor of the participating banks and, with respect to personal property, there has been no U.C.C. filing. Instead, the filed U.C.C. notice is the mortgage on the property that ran in favor of Liberty Bank. Central Bank asserts that if the participating banks wanted to perfect a security interest in the property, they should have filed appropriate documents to give notice to the world of their claims.

Finally, Central Bank cites cases standing for the proposition that a security interest in a promissory note can be perfected only by possession. *See In re Reeves*, 65 F.3d 670, 674 (8th Cir. 1995) (holding under Arkansas law); *McIlroy Bank v. First Nat'l Bank of Fayetteville*, 480 S.W.2d 127, 128 (Ark. 1972).

The trustee of Liberty Bank and the participating banks counter that, under the participation agreements, the participating banks obtained an undivided fractional interest not simply in the loan proceeds but in the collateral as well. While Central Bank sees the transaction merely as a loan of funds from the participating banks to Liberty, the trustee and the participating banks see the transaction as involving the sale, or partial assignment, of ownership interest in the loan and the underlying collateral.

The trustee and participating banks emphasize three aspects of the participation agreements to support their argument that the transaction involved the sale of an undivided interest in the loan, including the collateral. First, they stress language in the participation agreements which provides that the lead bank "shall hold the Note and Loan Documents, in trust, for the undivided interest of Participating Bank and

other participating banks." Second, they note the participation agreements provide that in the event of default of the underlying borrower,

> the interests of the Originating and Participating Banks in such Defaulted Loan and in any of the Security therefore shall be deemed ratably concurrent and any payments received thereafter . . . shall be applied in proportion to each Bank's respective interest in the total amount of the Defaulted Loan outstanding.

Finally, Exhibit A to the participation agreements includes a description of the loan, including the underlying collateral.

In support of their argument, the trustee and the participating banks cite *Asset Restructuring Fund, L.P. v. Liberty National Bank & Resolution Trust Corp.*, 886 S.W.2d 548 (Tex. App. 1994). In *Asset Restructuring,* the Texas appellate court adopted the view that a participation is "a complete transfer of ownership interest in the loan and collateral to the participant." *Id.* at 552 (quoting Bradford Anderson, *Loan Participations and the Borrower's Bankruptcy*, 64 Am. Bankr. L.J. 39, 40 (1990) [hereinafter Anderson]).

They argue that when the borrower voluntarily surrendered The Inn property to Liberty Bank, the participating banks had an undivided fractional interest in the real estate. They note that when Liberty Bank sold its interest in The Inn, it did so with a quitclaim deed. By using a quitclaim deed, the trustee and the participating banks argue that Liberty Bank transferred only its fractional interest in The Inn to Central Bank. According to the trustee and participating banks, a buyer of a quitclaim deed takes the transferred interest subject to outstanding equities, about which the buyer is assumed to have notice. *See Raymond v. Morrison,* 59 Iowa 371, 373, 13 N.W. 332, 333 (1882) (holding grantee in quitclaim deed takes grantor's interest only, no

protection from interests of which the grantee had no notice), *overruled on other grounds by Young v. Hamilton*, 213 Iowa 1163, 1173, 240 N.W. 705, 710 (1932). Thus, according to the trustee and the participating banks, Central Bank does not own The Inn property in fee simple, but instead the ownership is divided between Central Bank as successor to Liberty Bank's approximately fifty-nine percent interest and the participating banks.

The trustee and participating banks also argue that the interest of the participating banks in The Inn is a perfected interest under the U.C.C. The trustee and participating banks present the argument in several steps.

The first question is whether the participation agreements amount to a "security agreement" under the U.C.C. According to the trustee and participating banks, a "security agreement" means an agreement that creates or provides for a "security interest." Iowa Code § 554.9102(1)(*bv*). The trustee and participating banks assert that a "security interest" includes any interest of a buyer in "a payment intangible, or a promissory note in a transaction that is subject to Article 9." *Id.* § 554.1201(2)(*ai*).

The trustee and participating banks argue that the participation agreements in this case involve a "payment intangible." Under Iowa Code section 554.9102(1)(*bi*), a "payment intangible" is defined as "a general intangible under which the account debtor's principle obligation is a monetary obligation." The trustee and participating banks point out that under Official Comment 5 to U.C.C. section 9–109, a payment intangible includes a participation interest in a bank loan. *See* U.C.C. § 9–109 official cmt. 5, 3 U.L.A. 142 (Am. Law Inst. & Unif. Law Comm'n 2000).

The trustee and participating banks next consider when a security interest in the payment intangibles attaches. Under Iowa Code section 554.9203(1), the trustee and participating banks argue, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to that collateral." The term debtor means "a seller of . . . payment intangibles." Iowa Code § 554.9102(1)(*ab*)(2).

Further, the trustee and participating banks assert that when a security interest attaches to a right of payment there is an automatic attachment in any security interest that secures the right of payment. *See id.* § 554.9203(7). Thus, the trustee and participating banks argue that once a security interest attaches to the right to payment, it also includes a security interest in the underlying collateral. Further, the trustee and participating banks note that when the debtor has sold a payment intangible, the debtor does not retain legal or equitable interest in the collateral sold. *See id.* § 554.9318(1).

Finally, on the question of perfection, the trustee and participating banks assert that the interest of a buyer of a payment intangible is automatically perfected. *See id.* § 554.9309(3). And, perfection in a security interest in a right to payment also perfects a security interest in any real or personal property securing the right of payment. *See id.* § 554.9308(5). Further, according to the trustee and participating banks, a holder of a payment intangible has a perfected security interest in the proceeds of a payment intangible. *See id.* § 554.9315(3). Under the U.C.C., "proceeds" is defined as "whatever is collected on, or distributed on account of, collateral." *Id.* § 554.9012(1)(*bl*)(2). Thus, when Liberty Bank received the surrendered property, namely, The Inn, the surrendered property amounted to proceeds of the loan in which the participating banks had a perfected security interest.

**D. Overview of the Developing Law Related to Participation Agreements.** Historically, participation agreements have not always been subject to careful drafting, in part because the risk of default by a bank or other financial institution was thought to be very small. David B. Simpson, *Loan Participations: Pitfalls For Participants*, 31 Bus. Law. 1977, 1983 (1976) [hereinafter Simpson]. Events in the latter decades of the twentieth century undermined this assumption, and a body of caselaw and academic literature developed around various legal issues associated with participations. *See generally, e.g.*, Anderson, 64 Am. Bankr. L.J. at 39; Armstrong, 23 Bus. Law. at 689; Fisher, 44 Sw. L.J. at 753; Hutchins, 9 Rutgers-Camden L.J. at 447; Ledwidge, 51 Tenn. L. Rev. at 519; Simpson, 31 Bus. Law. at 1977; Debora L. Threedy, *Loan Participations—Sales or Loans? Or Is That the Question?*, 68 Or. L. Rev. 649 (1989).

The leading authorities find that the characterization of a participation agreement is critical to the legal consequences that flow from it. *See, e.g.*, Fisher, 44 Sw. L.J. at 768–79; Simpson, 31 Bus. Law. at 2022; Richard E. Weiner, *Rights of a Participant Bank Against a Lead Bank in a Participation Loan Agreement*, 104 Banking L.J. 529, 530 (1987) [hereinafter Weiner]. If the interest conveyed in a participation agreement is regarded as a sale or assignment of a fractional interest in the underlying loan, then the participant is deemed to "own" a portion of the loan and acquire by assignment all rights associated with the loan. Fisher, 44 Sw. L.J. at 769; Simpson, 31 Bus. Law. at 2022; Weiner, 104 Banking L.J. at 530. When the lead bank sells an ownership but maintains possession of the underlying note and loan documentation, the parties often state that the documents are held "in trust" by the lead

bank for the benefit of the participating banks.  Simpson, 31 Bus. Law. at 1992–95.

An ownership interest generally improves the position of the participant in the event of failure of the originating bank because, as a pro rata owner, the participating bank is not a mere general creditor standing in line for its often paltry share of the insufficient assets of the failed institution but actually owns an interest in the underlying assets. Hutchins, 9 Rutgers-Camden L.J. at 459–60; Fisher, 44 Sw. L.J. at 768–69.

On the other hand, if the participation agreement merely creates a debtor–creditor relationship between the originating bank and the participating bank, the participating bank has no ownership interest in the rights of the originating bank in underlying collateral.  Hutchins, 9 Rutgers-Camden L.J. at 458–59.  If the participant is merely a creditor of the originating bank, the participant must have a security interest in the underlying collateral or will be reduced to a general creditor of the originating bank in any bankruptcy or liquidation proceeding.  *Id.*

Participation agreements, of course, come in all kinds of shapes and sizes.  And, assuming the validity of the sale versus loan distinction, it is not always easy to make the call with respect to a particular participation agreement.  *See* Jason H. P. Kravitt et al., *Securitization Financial Assets* § 5.03 (3d ed. Supp. 2017), Westlaw SFINA (referring to a need "to temper one's expectation for guidance" in the cases) [hereinafter Kravitt]; Hutchins, 9 Rutgers-Camden L.J. at 458 ("[N]ot an easy task."); Simpson, 31 Bus. Law. at 1981 ("[T]he line between the two relationships is often indistinct.").

In determining whether a participation creates an ownership interest or a debtor–creditor relationship, some courts tend to give

presumptive weight to the intent of the parties, while others seek to divine the "true" nature of the transaction. Kravitt, § 5.03. The intent of the parties may not always be determinative. For example, the parties may declare that a "sale" has occurred, but then cloud the issue with provisions such as a "put" or guaranteed buy-back that minimizing the risk to the participating bank and makes the underlying nature of the transaction look like a loan rather than a purchase. Simpson, 31 Bus. Law. at 1981–82. Other provisions that minimize or lessen the risk to participating banks include payment of interest by the lead bank when the borrower has not paid or the payment of higher interest rates to the participating bank than to the lead bank. Alan W. Armstrong, *The Evolving Law of Participations*, R175 ALI-ABA 255, 263 (1992). Although attempts to recharacterize a loan as a sale may be relatively rare, experience shows that creatively labeling a goose as a duck may not always work. *See In re S.O.A.W. Enters., Inc.*, 32 B.R. 279, 282 (Bankr. W.D. Tex. 1983) (finding significant rate differential to be indicative of a loan rather than a sale); *Bernard v. Fireside Commercial Life Ins. Co.*, 633 So. 2d 177, 188 (La. Ct. App. 1994) (holding participation agreement with buy-back provision a loan); *see also* Hutchins, 9 Rutgers-Camden L.J. at 474 (stating "the theory that a participation creates a debt from the lead to the participant should be restricted to those rare cases in which the lead has guaranteed payment to the participant and the terms of the participation differ significantly from the terms of the loan made by the lead" (footnote omitted)).

That said, there are a number of factors that are often considered in determining whether a participation agreement amounts to a sale of an undivided interest in the total loan package or merely establishes a debtor–creditor relationship. The words "sale," "transfer," and

"assignment" are often associated with a sale. Wiener, 104 Banking L.J. at 529–30. Use of the phrase "undivided fractional interest" suggests an obligation on the part of the originating bank to monitor the loan in the best interest of the participants and suggests a sale. *See* Anderson, 64 Am. Bankr. L.J. at 40 n.5 (citing language such as the lead bank "assigned, transferred, and conveyed" an "undivided fractional interest" as creating a "partial assignment"); W.H. Knight, Jr., *Loan Participation Agreements: Catching Up with Contract Law*, 1987 Colum. Bus. L. Rev. 587, 613 (1987) [hereinafter Knight] ("Thus, the agreement's fractional interest language in essence evidences an intention that the participant receive a partial assignment of the lead's interest in the underlying loan.").

In addition, use of the word "trust" tends to cut against a mere debtor–creditor relationship in a participation agreement. Trust language in a participation agreement may obligate the originating bank to hold the debt, the security instruments, and all payments in trust for the participant. Fisher, 44 Sw. L.J. at 774–76; Ledwidge, 51 Tenn. L. Rev. at 526–27. In cases involving a failed originating institution, when possession of property is impressed with a trust, the trustee in bankruptcy holds such property subject to the outstanding interests of the beneficiaries. 2 Michael T. Madison, et al., *Law of Real Estate Financing* § 11.27, Westlaw (Nov. 2016 update) [hereinafter Madison]; Weiner, 104 Banking L.J. at 531.

There is a body of caselaw illustrating the above concepts. According to one commentator, a majority of cases have characterized a participation as "a complete transfer of ownership interest in the loan and collateral to the participant." Anderson, 64 Am. Bankr. L.J. at 40, 42–43. For example, in *Asset Restructuring Fund,* the Texas appellate

court concluded that it would follow the majority rule that "the participant has an ownership or trust interest in the loan and underlying collateral, not just in the collections from the loan." 886 S.W.2d at 552. Similarly, in *In re Drexel Burnham Lambert Group, Inc.*, the court declared,

> The lead bank, by participating the loan, assigns, transfers, and conveys an undivided percentage ownership interest in the collateral for the participated loan to the participant. . . . Accordingly, the loan participants are entitled to their shares as beneficiaries of a trust.

113 B.R. 830, 843 (Bankr. S.D.N.Y. 1990). Similar observations appear in other cases and commentaries. *See Jefferson Sav. & Loan Ass'n*, 396 F.2d at 24 (holding participant was "cotenant" with lead bank and "the beneficiary of the trust"); *see also* Mark E. MacDonald, *Loan Participations as Enforceable Property Rights in Bankruptcy—A Reply to the Trustee's Attack*, 53 Am. Bankr. L.J. 35, 39–41 & n.13 (1979) [hereinafter MacDonald] (noting "[a] partial assignment of a note and mortgage makes the participant a tenant in common of the mortgage security"); Simpson, 31 Bus. Law. at 1977 ("Where a loan is collateralized by real estate . . . , the participation will normally include the transfer of an undivided interest in the underlying collateral.").

There is some caselaw that seems at least somewhat to the contrary. For instance, in *In re Alda Commercial Corp.*, the district court considered whether an interest in property was transferred by a participation agreement when the participant received an undivided fractional interest in the loans. 327 F. Supp. 1315, 1316 (S.D.N.Y. 1971). The district court held that because the participant did not share in the lead's profits, played no role in the initial determination to make the loan, and did not manage the accounts or have any say as to security

and collection, the participant was not entitled to preferential treatment in the lead's bankruptcy on the ground that the lead was serving as its agent or trustee. *Id.* at 1317–18. Notably, however, the participation agreement did not include any "in trust"-type language.[1]

A frequently cited case supporting the view that a trust relationship negates the finding of a debtor–creditor relationship is *Stratford Financial Corp. v. Finex Corp.*, 367 F.2d 569 (2d Cir. 1996). In this case, the parties stated in their participation agreement that the borrower's notes were to be held by the lead "in trust" for the benefit of the purchaser of the participation. *Id.* at 571. The *Stratford* court held that when there was trust language, and the proceeds were identifiable and not comingled with the seller's, the purchaser was entitled to its share of the proceeds. *Id.*[2]

In order to introduce a degree of clarity, the literature contains a host of drafting recommendations. One expert urges use of *Stratford*-type "in trust" language as a planning device. *See* Ledwidge, 51 Tenn. L. Rev. at 527. Another has developed a sample loan participation sale and trust agreement containing the magic words the commentator finds helpful. *See* Michael T. Skindell, *Lead Lender Failure and the Pitfalls for the Unwitting Participant*, 42 Sw. L.J. 1071, 1100 (1989). Yet another

---

[1]In the literature, the leading commentators advocating the approach of *In re Alda Commercial Corp.* are W. Homer Drake, Jr. and Kyle R. Weems. *See* W. Homer Drake, Jr. & Kyle R. Weems, *Mortgage Loan Participations: The Trustee's Attack*, 52 Am. Bankr. L.J. 23, 35–36 (1978). For a response, see MacDonald, 53 Am. Bankr. L.J. at 35.

[2]No "in trust" language was utilized in the participation agreements in *Federal Deposit Insurance Corp. v. Mademoiselle of California*, 379 F.2d 660 (9th Cir. 1967) or *Chase Manhattan Bank, N.A.*, 554 F. Supp. 251. In these cases, the courts held that participants were not entitled to preferred pro rata payment of offset deposits. The result in these cases has been questioned. *See* Ledwidge, 51 Tenn. L. Rev. at 526. In any event, this case does not involve a right of set-off.

has declared that a participation agreement "should always convey to the participant an undivided ownership interest in the loan, loan documents and collateral, using typical language of purchase and sale." Marvin Rau, *Beyond the Handshake and a Prayer: Documenting the Modern Loan Participation*, 59-Jun. J. Kan. B. Ass'n 19, 20 (1990); *see also* 2 Madison, § 11.4 ("Since the lead is the only publically secured party . . . , the participants should require language in the agreement that the participants will become the owners of undivided fractional interest in all notes and underlying mortgage collateral to be held by the lead . . . in trust for the participants and the lead shall act as a trustee with fiduciary duties toward the participants."). As a general proposition, participants wishing to ensure that their interest is treated as an ownership interest and not a mere loan should use the language of ownership, undivided fractional interest, and trust, and avoid risk dilution devices that might persuade a court that true ownership is not present.

**E. Iowa Law Related to Participation Agreements and Quitclaim Deeds.**

1. *Participation agreements.* We have only a few occasions to consider the nature of a participating bank's interest in a participation agreement. In *Ross*, we considered whether a district court in Iowa had personal jurisdiction over a nonresident participating bank. 675 N.W.2d at 814. In considering this question, we noted that although the participation agreement had some elements of an assignment, "it falls well short of the traditional concept of an assignment because it merely involves the transfer of a portion of an intangible right." *Id.* at 817. We further noted that the participation agreement did not give the bank control over the collection of the loan. *Id.* We further emphasized that

the participant had no relationship with the underlying borrower. *Id.* We thus concluded that a mere participant cannot be hauled into an Iowa court without more to establish an adequate nexus to the forum jurisdiction. *Id.* at 818.

A second case is *In re Receivership of Mt. Pleasant Bank & Trust Co.*, 526 N.W.2d 549. In that case, we held the district court properly paid participating banks their pro rata share of loan proceeds. *Id.* at 556. We held the participating banks were not general creditors of the borrower but instead had an ownership interest in the collateral. *Id.*

2. *Quitclaim deeds.* We have considered the scope of legal interests conveyed by quitclaim deeds in a number of contexts. Over a century ago, we held that a grantee who takes real estate by a quitclaim deed cannot be regarded as a good-faith purchaser and is not entitled to protection as against prior equities of which he had no notice. *Raymond*, 59 Iowa at 373, 13 N.W. at 333. We have further stated that the grantee of a quitclaim deed is "conclusively presumed to have knowledge of all prior equities" and therefore is not entitled to protection of the recording statutes. *Duntz v. Ames Cemetery Ass'n*, 192 Iowa 1341, 1345, 186 N.W. 443, 445 (1922); *see also Brenton Bros. v. Bissell*, 214 Iowa 175, 183, 239 N.W. 14, 18 (1931).

**F. Analysis of Participation Agreements in This Case.** We now turn to consider the central questions posed in this case. We adopt the view of the majority of cases and commentators that a threshold question in cases involving an insolvent lead bank is determining whether the participation interests involved a sale of undivided ownership interests in the entire loan or whether the participation agreements merely established a debtor–creditor relationship.

We conclude the participation agreements in this case involved the sale of an undivided ownership interest in the entire loan. The participation agreements in this case do not have the kind of explicit language recommended by some of the commentators. Yet, there are a number of key markers.

First, the participation agreements state that the originating bank "hereby *sells* to the Participating Bank and the Participating Bank hereby *purchases* from the Originating Bank a participation interest." (Emphasis added.) The use of the terminology of a sale suggests that the participating bank is not making a loan to the originating bank, but is buying an ownership interest in the underlying loan. *See Asset Restructuring Fund*, 886 S.W.2d at 553 (noting agreement clearly states that participant "agreed to purchase" a participation in the loan).

Additionally, the participation agreement states that the originating bank shall "hold the Note and Loan documents, in trust, for the undivided interest of Participating Bank and other participating banks." Holding the note and loan documents in trust is not a characteristic of a typical loan agreement and has generally been thought to be a talisman of a sale of an ownership interest. *Franklin v. Comp'r*, 683 F.2d 125, 128 (5th Cir. 1982); *Jefferson Sav. & Loan Ass'n*, 396 F.2d at 24; *Stratford*, 367 F.2d at 570–71.

Further, the participation agreements provide that the participant holds an "undivided interest" in the documents held in trust, thereby reinforcing the notion that the participating banks are not loaning funds to the lead bank, but instead are co-owners of the entire loan, including the underlying collateral. *See In re Drexel Burnham Lambert*, 113 B.R. at 843; Knight, 1987 Colum. Bus. L. Rev. at 613.

The fact that the participating banks have an ownership interest in the underlying collateral is indicated by the default provision of the participation agreements, which emphasizes in the event of default, the participating banks shall ratably share in "any of the Security" of the loan.

We also note there are no disqualifying provisions in the participation agreement that suggest an effort to mitigate the risk of ownership. There is no buy-back provision, no marked difference in interest rates or other terms affecting the risk of a participant. *See In re S.O.A.W. Enters.*, 32 B.R. at 282; *Bernard*, 633 So. 2d at 188.

If the participating banks have an undivided ownership interest in the loan and the collateral, then Liberty Bank only owned a fifty-nine percent interest in The Inn after it was surrendered to the bank. The remaining forty-one percent ownership interest rested with the participating banks. When Liberty Bank sold its interest in The Inn to Central Bank, it transferred the property through a quitclaim deed. As has been clearly established above, purchasers of a quitclaim deed take the property subject to all outstanding equities. In short, Liberty Bank sold only its interest in The Inn—specifically, its fifty-nine percent interest. The participating banks continue to own their forty-one percent undivided interest purchased through the participating agreements. Because Central Bank received only a quitclaim deed from the trustee of Liberty Bank, it took the property subject to all outstanding equities, including those of the participating banks.[3]

---

[3]Central Bank does not claim to be a bona fide purchaser of a warranty deed from Liberty Bank. As indicated above, Central Bank received only a quitclaim deed from Liberty Bank. Further, Central Bank was aware there were participating banks in connection with Liberty Bank's loan collateralization by The Inn prior to receiving the quitclaim deed as part of the P&A Agreement. By taking a quitclaim deed with

In light of our conclusion regarding the limited ownership interest transferred by the quitclaim deed, we need not address the question of whether the participating banks had a "perfected" security interest in the real estate arising out of the participation agreements. We only hold that the ownership interest of the participating banks in the mortgage and underlying collateral is superior to Central Bank, which claims its interest is derivative of and limited to the interest held by Liberty Bank.

## IV. Conclusion.

For the above reasons, the ruling of the district court dismissing the declaratory judgment action brought by Central Bank is affirmed.

**AFFIRMED.**

---

knowledge that Liberty had procured participants in the loan, Central Bank cannot claim protection of real estate recording statutes.